VAUGHN, Justice,
for the Majority:
I. INTRODUCTION
This appeal arises from a merger agreement under which Energy Transfer Equity, L.P. (“ETE”), a Delaware limited partnership, agreed to acquire the assets of The Williams Companies, Inc., (“Williams”), a Delaware corporation. Both Williams and ETE are involved in the gas pipeline business; The Agreement and Plan of Merger (the “Merger Agreement” or “the Agreement”) signed by Williams and ETE contemplated two steps. In the first step, Williams would merge into a new entity, Energy Transfer Corp LP (“ETC”), a Delaware limited partnership taxable as a corporation. ETE would transfer $6.05 billion in cash to ETC in exchange for 19% of ETC’s stock.[1] The $6.05 billion and 81% of ETC’s stock would be distributed to the Williams stockholders in exchange for their Williams stock. In step two, ETC would transfer the Williams assets to ETE in exchange for newly issued ETE Class E partnership units. The number of Class E units transferred and ETC shares issued would be the same number and the two were expected to be similar in value. The result would be that the Williams shareholders would receive $6.05 billion plus 81% of ETC’s stock, ETE would receive the Williams assets and 19% of ETC’s stock, and ETC would own ETE Class E partnership units equal in number to the shares issued by ETC. The merger was conditioned upon the issuance of an opinion by ETE’s tax counsel, Latham & Watkins LLP (“Latham”), that the second step of the transaction, the transfer of Williams’ assets to ETE in exchange for the Class E partnership units, “should” be a tax-free exchange of a partnership interest for assets under Section 721(a) of the Internal Revenue Code[2] (the “721 opinion”). The Agreement also contained provi *267 sions that required the parties to use “commercially reasonable efforts” to obtain the 721 opinion[3] and to use “reasonable best efforts” to consummate the transaction.[4]
After the parties entered into the Agreement, the energy market suffered a severe decline which caused a significant loss in the value of assets of the type held by Williams and ETE. This caused the transaction to become financially undesirable to ETE. It also led to ETE raising an issue as to whether the IRS might view a portion of the $6.05 billion not as payment only for the ETC stock, but as payment in part for the Williams assets, thus rendering the second step of the merger taxable. This issue ultimately led to Latham being unwilling to issue the 721 opinion. Since the 721 opinion was a condition of the transaction, ETE indicated that it would not proceed with the merger.
Williams then sought to enjoin ETE from terminating the Merger Agreement, arguing that ETE breached the Agreement by failing to “use commercially reasonable efforts” to obtain the 721 opinion and “reasonable best efforts” to consummate the transaction. Williams also argued that ETE was estopped from terminating the Agreement by a representation it made in the Agreement that it knew of no facts that would prevent the second step of the transaction from being treated as tax-free at the time the parties entered into the agreement.
The Court of Chancery rejected Williams’ arguments. Williams argues on appeal that the Court of Chancery erred by interpreting “commercially reasonable efforts” and “reasonable best efforts” as imposing on ETE only a negative duty not to obstruct performance of the Agreement. The Court should, Williams contends, have interpreted the covenants as creating affirmative obligations on the part of ETE to work to ensure performance of the Agreement. Williams also argues that the Court of Chancery should have recognized that ETE’s acts and omissions failed to comply with its affirmative obligations to try to obtain the 721 opinion. Williams further argues that the Court of Chancery erred by placing upon it the burden of proving that ETE’s breach of covenants materially contributed to the failure of the closing condition and that it should have shifted that burden to ETE. Finally, it argues that ETE should be estopped from terminating the Agreement because it represented in the Agreement that it did not “know[ ] of the existence of any fact that would reasonably be expected to prevent [the transaction] from qualifying as an exchange to which Section 721(a) of the Code applies.”[5]
In rejecting Williams’ arguments, the Court of Chancery concluded that ETE did not breach its covenants. For the reasons which follow, we find that the Court adopted an unduly narrow view of the obligations imposed by the covenants. We also agree with Williams that if a proper analysis of ETE’s covenants led to a conclusion that ETE breached those covenants, the burden would shift to ETE to prove that its breaches did not materially contribute to the failure of the closing condition.
The Court of Chancery concluded that Latham’s determination that it could not issue the 721 opinion was a good faith determination made by it independent of any conduct by ETE. This finding of fact *268 is not challenged on appeal.[6] Since the facts as found by the Court of Chancery are that ETE’s conduct, or lack of conduct, did not contribute to Latham’s decision not to issue the 721 opinion, we are satisfied that when the burden of proving that ETE’s alleged breach of covenants is properly placed on it, ETE did meet its burden of proving that any alleged breach of covenant did not materially contribute to the failure of the Latham condition.
We also agree with the Court of Chancery’s finding that ETE was not estopped from terminating the Agreement. Accordingly, the judgment of the Court of Chancery will be affirmed.
II. FACTS AND PROCEDURAL HISTORY
Williams, a Delaware corporation, is an energy infrastructure company which owns and operates midstream assets and interstate natural gas pipelines. ETE is a Delaware limited partnership which, along with its family of companies, owns and operates tens of thousands of miles of pipelines which transport natural gas, natural gas liquids, refined products, and crude oil. Williams and ETE entered into the above-described Merger Agreement in September, 2015,
As mentioned, the parties agreed that a condition precedent to the merger was that ETE’s tax counsel, Latham, issue an opinion that the second step of the transaction, ETC’s transfer of Williams’ assets to ETE in exchange for partnership units of ETE, “should” qualify as tax free under Section 721(a) of the Internal Revenue Code.[7] Section 721 provides that “[n]o gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.”[8] In addition to agreeing that the parties would use “commercially reasonable efforts” to obtain this tax opinion,[9] the parties broadly agreed that they would use their “reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable” the merger.[10] At the time that the parties entered into the Agreement, the parties and their tax advisors all believed that the second step of the transaction would qualify as tax free under § 721(a).
After the energy market went into a severe decline, ETE’s publicly traded partnership units dwindled to between a third and half of their value as compared to their value at the time the Agreement was signed, leaving ETE concerned about the effect of fulfilling its $6.05 billion cash obligation to ETC. The parties discussed restructuring or terminating the Agreement, but were unable to reach an alternative arrangement. The record is quite clear that ETE strongly desired that the transaction not go forward.
ETE explored financing alternatives and ultimately decided to issue a new class of equity units that would reduce its cash distributions in the short term. ETE pursued a potential public offering of those units. Williams, however, refused to dis *269 close financial information that was required for ETE to complete the necessary filings with the Securities and Exchange Commission. On March 8, 2016, ETE completed a private offering of convertible units instead.
In March 2016, while evaluating what steps ETE might take to respond to the down turn in the ■ energy market, Brad Whitehurst, ETE’s Head of Tax, according to his testimony, discovered an aspect of the second step of the transaction which he had not previously considered. He testified that he originally thought that the $6.05 billion was to be exchanged for a floating number of ETC shares. In March, he realized that it was to be exchanged for a fixed number of shares. Whitehurst then realized that the decline in ETE’s unit price caused the 19% of ETC shares, which ETE was to receive in the merger, to be worth substantially less than the $6.05 billion ETE was obligated to pay for those shares. He testified that the ETC shares which ETE was to receive would be worth only about $2 billion. He was concerned that the IRS might attribute a portion of the $6.05 billion to the acquisition of the Williams assets, causing the second step in the merger to become a taxable event.
Whitehurst notified ETE’s chairman of his concern and on March 29, 2016, White-hurst contacted Latham and asked it to consider whether the difference in value between the $6.05 billion and the 19% of ETC shares would cause a tax problem. Prior to this, Latham was fully prepared to issue the 721 opinion and had not considered how a change in ETE’s unit price would affect its opinion. The attorneys at Latham extensively analyzed the transaction. After consulting with Wachtell, Lipton, Rosen <& Katz, ETE’s deal counsel, and Vinson & Elkins LLP, ETE’s litigation counsel, Latham indicated to ETE that, it was likely unable to issue the 721 opinion.
On April 7, 2016, Whitehurst contacted Morgan, Lewis & Bockius (“Morgan Lewis”), ETE’s specially retained tax counsel, and asked that firm to analyze the tax consequences of the Merger Agreement, specifically expressing his concern about the decreased value of ETE’s partnership units.
On April 11, 2016, Latham informed ETE that it had conclusively determined that it would be unable to issue the 721 opinion as of that date. Latham was concerned that the IRS could attribute the amount by which the $6.05 billion exceeded the value of the ETC stock to the Williams assets under the disguised sale rules in Section 707 of the Internal Revenue Code. It communicated its position to Cravath, Swaine & Moore LLP (“Cravath”), Williams’ tax and deal counsel, the next day.
In the meantime, Morgan Lewis—inde-péndent of and without consulting La-tham—concluded that it could not issue a 721 opinion if asked. Morgan Lewis was concerned that the IRS might conclude that the parties had specifically allocated the cash to the ETC stock (and not to the Williams assets) for tax purposes, and that the second step was likely taxable as a disguised sale.
Cravath disagreed with Latham’s conclusion, but on April 14, 2016 it offered two proposals that it thought would potentially fix the issue with the 721 opinion. Latham reviewed the proposals and determined that neither would result in its issuance of the 721 opinion.
In an April 18, 2016 amendment to ETC’s proxy statement, ETE disclosed that Latham had advised that as of that time it would not be able to deliver a 721 opinion.
*270 In late April, Cravath then had Gibson, Dunn & Cruther, LLP, Williams’ other deal counsel, review the issue. It ultimately determined that it could give a “weak-should” opinion if asked, but initially acknowledged that it would be difficult to reach such a conclusion.[11] At the time of the proceedings below, Latham held the position that it would be unable to issue the 721 opinion and anticipated that it would be unable to do so by the closing date.
Williams filed its first complaint against ETE and LE GP, LLC on April 6, 2016, challenging ETE’s private offering of convertible partnership units. While the parties were engaged in discovery on that matter, Williams filed its second complaint against ETE, ETE Corp GP, LLC, and Energy Transfer Equity GP, LLC on May 13, 2016, challenging the defendants’ actions with regard to obtaining the 721 opinion from Latham. The Court of Chancery ordered that the issues be litigated together and held a trial for both actions on June 20 and 21, 2016. This appeal concerns only Williams’ claims regarding the 721 opinion.
In its second complaint, Williams asserted its claims that ETE breached the Agreement by failing to use “commercially reasonable efforts” to obtain the 721 opinion from Latham and “reasonable best efforts” to complete the transaction and, therefore, could not rely on the failure of the 721 opinion condition to terminate the agreement; and that ETE misrepresented that it knew of no facts that would reasonably prevent the second step of the transaction from being treated as tax-free, which estopped ETE from terminating the Agreement. Williams sought a declaration that the defendants had committed material breaches of the Agreement and a permanent injunction to enjoin the defendants from terminating the Agreement.
The Court of Chancery began its analysis by deciding whether Latham’s conclusion that it could not issue the 721 opinion was made in good faith. It carefully and extensively considered the facts and circumstances surrounding Latham’s decision not to issue the 721 opinion. The Court noted that the parties deliberately conditioned the merger on Latham’s subjective opinion that the transaction “should” be tax free under § 721(a), meaning that “it is quite likely that the [tax] decision will be upheld.”[12]
The Court of Chancery realized that La-tham had competing interests with regard to its issuance of the 721 opinion: while Latham’s client, ETE, would benefit substantially from its refusal to issue the 721 opinion, Latham also had an interest in maintaining its reputation by delivering an opinion that was consistent with its preliminary assessment from the time that the parties entered into the Agreement. The Court concluded that Latham’s ultimate refusal to issue the 721 opinion went against its reputational interests. After reviewing the testimony, the Court found that “Latham took this responsibility [to deliver the 721 opinion] seriously.”[13] The Court noted that there were a variety of opinions reached regarding the tax consequences of the transaction which indicated “the closeness of the issue and the unusual nature of the transaction here.”[14] The Court came to the conclusion that Latham acted independently and in good faith in *271 determining that it could not issue the 721 opinion. The Court therefore found that as of the date of its opinion, the 721 opinion condition had not been satisfied.
The Court of Chancery next considered Williams’ claim that ETE breached its contractual obligation to use commercially reasonable efforts to obtain the 721 opinion. It began by noting that the term “commercially reasonable efforts” was not defined in the Agreement and there is no case law clearly defining the phrase. It then examined the discussion of “reasonable best efforts” which appears in the Court of Chancery case of Hexion Specialty Chemicals, Inc. v. Huntsman Corp.[15] The Court found that Hexion equated “reasonable best efforts” with good faith, and that “reasonable best efforts” was similar to “commercially reasonable efforts.”[16] From this, it concluded that ETE was “bound ... to do those things objectively reasonable to produce the desired 721 Opinion.”[17]
The Court observed that Williams could not point to any commercially reasonable efforts, or objectively reasonable actions, that ETE could have taken to secure the 721 opinion from Latham. The Court also found that Whitehurst did not breach the “commercially reasonable efforts” covenant merely by bringing the § 721 issue to Latham’s attention because, as the Vice Chancellor had already determined, La-tham made its determination independently and in good faith. The Court also addressed Williams’ heavy reliance on the Hexion[18] case by distinguishing the case from the facts before him. It noted that in Hexion, the company hired an advisor and “knowingly fed the advisor misleading or inaccurate information” to receive an opinion that would allow it to avoid a merger.[19] In the current case, the Court of Chancery observed that the record did not reflect any affirmative acts taken by ETE to mislead Latham and prevent the issuance of the 721 opinion.
Finally, the Court of Chancery addressed Williams’ claim that ETE falsely represented that it knew of nothing that would indicate that the 721 opinion could not be issued as of the date the Agreement was signed. It noted that Latham’s analysis was not a “fact” that required disclosure and was instead a theory of tax liability that was not developed at the time of signing the Agreement.[20] The Court concluded that ETE did not breach its representations and warranties regarding the 721 opinion.
Based on its analysis, the Court of Chancery denied Williams’ request to enjoin ETE from terminating the merger based on the failure to obtain the 721 opinion from Latham. This appeal followed.
III. STANDARD OF REVIEW
“We review the Court of Chancery’s conclusions of law de novo and its factual findings with deference.”[21]
IV. DISCUSSION
A.
Williams first claims that the Court of Chancery erred by improperly deciding *272 that ETE did not breach its efforts obligations because it interpreted “commercially reasonable efforts” and “reasonable best efforts” as imposing only a negative duty not to thwart or obstruct performance of the Agreement, rather than an affirmative duty to help ensure performance. It argues that the Court of Chancery should have recognized that ETE’s acts and omissions constituted a breach of its covenants because those acts and omissions were a failure by ETE to comply with its affirmative obligations to try to obtain the 721 opinion.
Pertinent findings by the Vice Chancellor on this issue are as follows:
Williams has not pointed to other facts which [ETE] withheld from or misrepresented to Latham that have caused it to withhold the 721 Opinion. There is simply nothing that indicates to me that [ETE] has manipulated the knowledge or ability of Latham to render the 721 Opinion, or failed to fully inform La-tham, or do anything else, whether or not commercially reasonable, to obstruct Latham’s issuance of the condition-precedent 721 Opinion, or that had a material effect on Latham’s decision. Therefore, I have no basis to find that [ETE] is in material breach of the commercially reasonable efforts requirement.[22]
The Vice Chancellor distinguished Hex-ion from the present case:
Unlike the record in this case, in Hexion the buyer actively and affirmatively torpedoed its ability to finance. If the record here reflected affirmative acts by [ETE] to coerce or mislead Latham, by which actions it prevented the issuance of the [721 Opinion], the facts here would more resemble Hexion, and the outcome here would likely be different.[23]
The Court of Chancery in this case took an unduly narrow view of Hexion. The buyer in Hexion required financing to complete the transaction.[24] With respect to the financing requirement, the court there observed that “to the extent that an act was both commercially reasonable and advisable to enhance the likelihood of consummation of the financing, the onus was on [the buyer] to take that act.”[25] After the buyer developed concerns about the solvency of the combined entity, the court in Hexion observed that “a reasonable response to such concerns might have been to approach the [seller’s] management to discuss the issue and potential resolutions of it.”[26] Later, after the buyer consulted with advisors and developed a more substantial solvency concern, the court observed that the buyer “was then clearly obligated to approach [the seller’s] management to discuss the appropriate course to take to mitigate” the solvency concerns,[27] The buyer chose not to approach the seller’s management, and the court reasoned “[that] choice alone would be sufficient to find that [the buyer] had knowingly and intentionally breached its covenants under the merger agreement.”[28] Hexion, with which we agree, recognized that covenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction.[29]
*273 Section 5.03 of the Agreement in this case states:
[The parties] shall use [their] reasonable best efforts to, and shall cause their respective Affiliates to use reasonable best efforts to, take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper, or advisable to consummate and make effect, in the most expeditious manner practicable, the [merger] ...[30]
This language not only prohibited the parties from preventing the merger, but obligated the parties to take all reasonable actions to complete the merger. Section 5.03 also provides that the parties will “us[e] reasonable best efforts to accomplish the following: (i) the taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable.”[31]
Section 5.07 states that “[the parties] shall cooperate and each use its commercially reasonable efforts to cause (i) the Merger to qualify for [tax free treatment under Section 721].”[32] These provisions placed an affirmative obligation on the parties to take all reasonable steps to obtain the 721 opinion and otherwise complete the transaction. The Court of Chancery erred here by focusing on the absence of any evidence to show that ETE caused Latham to withhold the 721 opinion.
There was evidence, recognized by the Court of Chancery, from which it could have concluded that ETE did breach its covenants, including evidence that ETE “did not direct Latham to engage earlier or more fully with Williams’ counsel, failed itself to negotiate the issue directly with Williams, failed to coordinate a response among the various players, went public with the information that Latham had declined to issue the 721 Opinion, and generally did not act like an enthusiastic partner in pursuit of consummation of the [Merger Agreement].”[33] For the foregoing reasons, the Court of Chancery did not properly analyze whether or not ETE breached its covenants.
B.
Williams next contends that, after finding that ETE breached its covenants, the Court of Chancery should have shifted the burden to ETE to prove that its breach did not materially contribute to the failure of the closing condition. We agree that once a breach of a covenant is established, the burden is on the breaching party to show that the breach did not materially contribute to the failure of the transaction.[34] The plaintiff has no obligation to show what steps the breaching party could have taken to consummate the transaction,[35] To the extent the Vice Chancellor discusses the burden of proof on causation in the text of his opinion, he appears to improperly place that burden *274 upon'Williams with comments such as this: “Williams can point to no commercially reasonable efforts that [ETE] could have taken to consummate the [merger]; specifically, in this context, actions available to [ETE] that would have caused Latham, acting in good faith, to issue the 721 Opinion.” [36]
This quotation appears in the section of the Court of Chancery’s opinion in which it analyzes whether ETE breached its covenants. Since the Court concluded that ETE did not breach its covenants, it did not separately analyze in the text of its opinion whether a breach of covenant materially contributed to the failure of the transaction. It did, however, acknowledge and address the burden of proof issue in a footnote:
Williams appears, in post-trial briefing to argue that the burden is on [ETE] to demonstrate a negative—that its lack of more forceful action after discovering the Section 721(a) problem did not cause Latham’s inability to render the 721 Opinion. Williams cites this Court’s decision in WaveDivision Holdings, LLC v. Millennium Digital Media Sys., LLC for the proposition that “[i]t is an established principle of contract law that where a party’s breach by nonperformance contributes materially to the nonoccurrence of a condition of one of his duties, the nonoccurrence is excused,” and that “once it has been determined that [a defendant] breached [the contract], the burden of showing that breach did not materially contribute to [failure of the condition] is properly placed on [the defendant].” This is unremarkable; once a plaintiff has demonstrated a breach leading to adverse consequences, it is an affirmative defense that the consequences were otherwise unavoidable. The problem for Williams is that the record is barren of any indication that the action or inaction of the Partnership (other than simply drawing Latham’s attention to the problem) contributed materially to Latham’s inability to issue the 721 Opinion. This is true regardless of whether [ETE’s] actions were commercially reasonable. In other words, no matter how I allocate the burden of proof, the result is the same.[37]
This footnote demonstrates that the Court of Chancery considered the result it would reach if it found that ETE breached its covenants as alleged by Williams and shifted the burden to ETE to show that such breach did not materially contribute to the failure of the 721 opinion condition. The Court finds in its footnote that when so analyzed, ETE met its burden by showing “that the record is barren of any indication that the action or inaction of the Partnership (other than simply drawing Latham’s attention to the problem) contributed materially to Latham’s inability to issue the 721 Opinion.”[38] This determination is based on findings of fact which are not clearly erroneous. For this reason, we have concluded that Williams’ argument that the Court of Chancery should be reversed because it improperly placed the burden of proving causation upon it, must fail.
C.
Finally, Williams claims that ETE is equitably estopped from terminating the Merger Agreement because at the *275 time the agreement was entered into, ETE represented that it did not “knowt ] of the existence of any fact that would reasonably be expected to prevent [the transaction] from qualifying as an exchange to which Section 721(a) of the Code applies.”[39]
The doctrine of equitable estoppel may be invoked “when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.” To establish estoppel it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance.[40]
Williams claims that it relied on ETE’s above-quoted representation when it agreed to enter into the particular transaction structure contained within the Merger Agreement, including the 721 opinion condition. Williams contends that when ETE ultimately became concerned about the 721 opinion, the facts and law surrounding the transaction had not changed, and Latham should have considered the possibility that the value of ETE’s partnership units could decline when it initially represented that the transaction would qualify as tax free.
However, ETE did not fail to disclose any facts known to it at the time the agreement was signed. What changed was Latham’s theory of tax liability. There is nothing in the record to suggest that La-tham’s ultimate tax theory, which took into account ETE’s devalued partnership units, existed at the time the agreement was signed and was withheld from Williams. Williams contends that ETE conveniently pointed out the potential tax issue to La-tham as a way to terminate the agreement once it became financially undesirable to ETE. However, the Court of Chancery accepted Whitehurst’s testimony that he only realized the potential issue when he was considering the tax implications of potential actions for ETE to take in response to the decline in the energy market. Therefore, there is nothing to indicate that ETE knew of this potentially problematic theory of tax liability at the time it made its representations and chose not to disclose it to Williams. At the time ETE entered into the agreement, it desired the consummation of the Merger Agreement and likely would have wanted to address any problem that could result in either party terminating the agreement. Therefore, ETE did not breach its representations and warranties and Williams’ estop-pel argument fails.
Y. CONCLUSION
For the foregoing reasons, the judgment of the Court of Chancery is affirmed. The time for filing a motion for reargument is shortened to seven days.[41]

. While ETE and ETC are the primary defendants discussed in this opinion, the relationship of the remaining defendants is as follows: ETE Corp GP, LLC is a Delaware limited liability company and the general partner of ETC; LE GP, LLC is a Delaware limited liability company and the general partner of ETE; Energy Transfer Equity GP, LLC is a Delaware limited liability company that, pursuant to the Merger Agreement, would merge with LE GP, LLC and be the surviving entity and general partner of ETE. Following the merger, ETC was to become the managing member of Energy Transfer Equity GP, LLC.

. "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.” I.R.C. § 721(a).

. App. to Appellant’s Opening Br. at 680 (Merger Agreement, § 5.07(b)).

. Id. at 671 (Merger Agreement, § 5.03(a)).

.Id. at 652 (Merger Agreement at § 3.02(n)(i)).

. At oral argument,' counsel for Williams acknowledged that Williams was not challenging the Court of Chancery’s finding that La-tham’s determination was made in good faith.

. I.R.C. § 721(a).

. Id,

. App. to Appellant’s Opening Br. at 680 (Merger Agreement § 5.07(b)).

. Id. at 671 (Merger Agreement § 5.03(a)).

. Williams Companies, Inc. v. Energy Transfer Equity, L.P., 2016 WL 3576682, at *8 (Del. Ch. June 24, 2016).

. Id. at *11.

. Id. at *13.

. Id. at *14.

. 965 A.2d 715 (Del. Ch. 2008).

. Williams Companies, Inc., 2016 WL 3576682, at *16.

. Id.

. 965 A.2d 715 (Del. Ch. 2008).

. Williams Companies, Inc., 2016 WL 3576682, at *18.

. Id. at *19.

. SV Inv. Partners, LLC v. ThoughtWorks, Inc., 37 A.3d 205, 209-10 (Del. 2011).

. Williams Companies, Inc., 2016 WL 3576682, at *17 (emphasis added).

. Id. at *18.

. Hexion, 965 A.2d at 724.

. Id. at 749 (emphasis added).

. Id. (emphasis added).

. Id. at 750.

. Id.

. See id. at 755-56. "[The buyer’s] utter failure to make any attempt to confer with [the seller] when [the buyer] first became concerned with the potential issue of insolvency, both constitutes a failure to use reasonable *273 best efforts to consummate the merger and shows a lack of good faith.” Id,

. App. to Appellant's Opening Br. at 671 (Merger Agreement § 5.03(a)) (emphasis added).

. Id. (emphasis added).

. Id. at 680 (Merger Agreement § 5.07(b)) (emphasis added).

. Williams Companies, Inc., 2016 WL 3576682, at *17.

. Restatement (Second) of Contracts § 245 cmt, B (1981).

. Bloor v. Falstaff Brewing Corp., 601 F.2d 609 (2d. Cir. 1979). "Plaintiff was not obliged to show just what steps [the defendant] could reasonably have taken” to facilitate the agreement. Id. at 614.

. Williams Companies, Inc., 2016 WL 3576682, at *16.

. Id. at *16 n.130 (internal citations omitted),

.Id.

. App. to Appellant’s Opening Br. at 652 (Merger Agreement § 3.02(n)(i)).

. Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990) (quoting Wilson v. American Ins. Co., 209 A.2d 902, 903-04 (Del. 1965)) (internal citation omitted).

.Supr. Ct. R. 18.