# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE WILLIAMS COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) C.A. No. 12168-VCG | |
| | ) | |
| ENERGY TRANSFER EQUITY, L.P. | ) | |
| and LE GP, LLC, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |
| | ) | |
| | ) | |
| THE WILLIAMS COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) C.A. No. 12337-VCG | |
| | ) | |
| ENERGY TRANSFER EQUITY, L.P., | ) | |
| ENERGY TRANSFER CORP LP, ETE | ) | |
| CORP GP, LLC, LE GP, LLC, and | ) | |
| ENERGY TRANSFER EQUITY GP, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 29, 2017
Date Decided: December 1, 2017

Kenneth J. Nachbar and Zi-Xiang Shen, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; OF COUNSEL: Sandra C. Goldstein, Antony L.

Ryan, and Kevin J. Orsini, of CRAVATH, SWAINE & MOORE LLP, New York, NY, *Attorneys for the Plaintiff and Counterclaim Defendant*.

Rolin P. Bissell, Tammy L. Mercer, and James M. Yoch, Jr., of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, DE; OF COUNSEL: Michael C. Holmes, John C. Wander, Michael L. Charlson, and Craig E. Zieminski, of VINSON & ELKINS LLP, Dallas, TX, *Attorneys for the Defendants and Counterclaim Plaintiffs*.

GLASSCOCK, Vice Chancellor

What, Langston Hughes asked, becomes of a dream deferred?[1] When the dream is a multi-billion-dollar merger that changing market conditions no longer favor, it seems, it becomes a carcass that, like those of millions of turkeys featured in the holiday feasts just past, is diligently picked over. The carcass here is the remnant of the dreamed-of merger of The Williams Companies, Inc. ("Williams") and Energy Transfer Equity, L.P. ("ETE" or the "Partnership"). The matter came before me just before its demise, as Williams unsuccessfully fought for injunctive relief to force consummation, a result vigorously opposed by ETE. Thereafter, the parties pursued actions against one another for contractual damages under the merger agreement. Before me now is Williams' Motion to Dismiss ETE's counterclaims. ETE, having successfully resisted Williams' attempt to force consummation of the merger, is in the unlikely position of arguing that it is also entitled to a billion-dollar breakup fee under the merger agreement. ETE, however, was able to walk away from the merger based on the failure of a condition precedent: the inability of its counsel to opine that the merger "should" trigger favorable tax treatment. Since none of the allegations of breach supporting ETE's entitlement to the breakup fee caused, or even relate to, ETE's exercise of its right to avoid the merger, and, fundamentally, because the contract language it relies on is not

---

[1] *Harlem*, Langston Hughes, Collected Poems (1994).

1

supportive, I find ETE's counterclaim seeking the breakup fee not viable. My analysis of ETE's remaining counterclaims is mixed. My reasoning follows.

## I. BACKGROUND

This Memorandum Opinion assumes familiarity with the facts outlined in the previous Opinions of both this Court and the Supreme Court. "The reader is forewarned that this case involves a maze of corporate entities and an alphabet soup of corporate names."[2] This Opinion includes only those facts necessary to my analysis.

### A. The Merger Agreement and Failure of a Condition

The parties are significant players in the energy pipeline business.[3] Counterclaim Plaintiffs ETE and its affiliate Energy Transfer Corp LP ("ETC") are Delaware limited liability partnerships.[4] Counterclaim Defendant Williams is a Delaware corporation.[5]

Williams and ETE negotiated a merger as set out in an Agreement and Plan

---

[2] *Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *1 (Del. Ch. Oct. 6, 2017) (quoting *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *2 (Del. Ch. Sept. 18, 2014)).

[3] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.* (*Williams' Second Action*), 2016 WL 3576682, at *1 (Del. Ch. June 24, 2016).

[4] In addition, Counterclaim Plaintiffs LE GP, LLC ("LE GP"), ETE Corp GP, LLC ("ETE Corp"), and Energy Transfer Equity GP, LLC ("ETE GP") are Delaware limited liability companies. Defs.' and Countercl. Pls.' Second Am. & Supplemental  Affirm. Defenses & Verified Countercl. (the "Countercl." or the "Counterclaim Complaint") ¶¶ 41–45.

[5] *Id*. ¶ 46.

of Merger dated September 28, 2015 (the "Merger Agreement" or "Agreement").[6]

Under the Merger Agreement, Williams would merge into ETC (the "Merger") in exchange for ETC stock, $6.05 billion in cash, and certain other rights.[7] Post-Merger ownership of ETC would be split, with 19% held by the Partnership and 81% by former Williams stockholders.[8]

After ETE and Williams signed the Merger Agreement, the energy industry—and particularly the outlook for ETE and Williams—declined substantially.[9] In reaction to this decline—although its precise motives are in dispute—ETE issued new units to certain large ETE equity holders after signing the Merger Agreement (the "Special Issuance").[10] Ultimately, ETE's tax counsel, Latham & Watkins LLP ("Latham"), decided that it could not issue a tax-related opinion with the required confidence level to satisfy a condition precedent for the Merger to close.[11] Relying on the failure of this condition precedent, ETE exercised its right to terminate the Agreement on June 29, 2016.[12]

---

[6] *Id.* ¶ 48 (including a Letter Agreement dated May 24, 2016 and noting that the Merger Agreement was amended on May 1, 2016); *Williams' Second Action*, 2016 WL 3576682 at *1.

[7] Countercl. ¶ 48; *Williams' Second Action*, 2016 WL 3576682 at *3.

[8] *Williams' Second Action*, 2016 WL 3576682 at *3, 6.

[9] Countercl. ¶ 3.

[10] *Id.* ¶¶ 143–46, 149–50, 158–59; *Williams' Second Action*, 2016 WL 3576682 at *4.

[11] Countercl. ¶¶ 171–77; Merger Agreement § 6.01(h).

[12] Countercl. ¶ 7; *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 275 (Del. 2017) (denying Williams' request to enjoin ETE from terminating the Merger Agreement).

*B. Procedural History*

The parties quickly became entangled in litigation. Williams challenged the Special Issuance and filed its first Verified Complaint against the Partnership and LE GP on April 6, 2016 (the "First Action"), arguing that equitable relief was necessary to preserve the Merger Agreement.[13] Williams filed a Verified Amended Complaint on April 19, 2016 (the "Second Action") against the Defendants to specifically enforce the Agreement and compel ETE to comply.[14] I found that ETE was entitled to terminate the Agreement because Latham's inability to issue the tax opinion was a failure of a condition precedent under that Agreement.[15] Williams appealed to the Supreme Court, which affirmed, in pertinent part, the Opinion below.[16] Williams also filed suit against ETE CEO and Chairman Kelcy Warren in Texas state court for tortious interference with contract, but the suit was dismissed as incompatible with the forum selection clause in the Merger Agreement.[17]

Williams seeks contract damages in the current litigation. ETE brought counterclaims and alleges that Williams breached provisions of the Agreement

---

[13] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, C.A. No. 12168-VCG (Del. Ch. Apr. 6, 2016); a separate challenge to ETE's issuance is also proceeding before me. *In re Energy Transfer Equity L.P. Unitholder Litig.* (*ETE Unitholder Litig.*), 2017 WL 782495, at *1 (Del. Ch. Feb. 28, 2017).

[14] The actions are now combined in the present matter. *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, C.A. No. 12337-VCG (Del. Ch. Nov. 30, 2016).

[15] *Williams' Second Action*, 2016 WL 3576682 at *21.

[16] *Williams Cos.*, 159 A.3d at 275.

[17] Countercl. ¶¶ 72, 168–69.

pertaining to (i) the board recommendation requirement, (ii) the forum selection clause, and (iii) the reasonable best efforts, disclosure, and financing cooperation requirements. ETE contends that, as a result of these breaches, Williams owes ETE $1.48 billion (the "Termination Fee") and other damages.[18] Currently before me is Williams' Motion to Dismiss those counterclaims. Because these alleged breaches largely rely on my interpretation of the Merger Agreement, I include significant portions of that Agreement below.

*C. The Board Recommendation Claim*

ETE alleges that Williams breached the board recommendation and reasonable best efforts provisions of the Agreement by making negative comments about Warren in press releases, public filings, pleadings in a lawsuit against Warren in Texas state court, and by "failing to reconsider the recommendation" of the Merger in light of changes "described in [Williams'] Form S-4" that "gutted the foundations for the original recommendation."[19] The required "Company Board Recommendation" (or the "Recommendation") was defined in Section 3.01(d) of the Merger Agreement:

> The *Board of Directors of the Company duly and validly adopted resolutions* (A) approving and declaring advisable this Agreement, the Merger and the other Transactions, (B) declaring that it is in the *best interests of the stockholders* of the Company that the Company enter into this Agreement and consummate the Merger and the other

---

[18] Countercl. ¶ 8.
[19] *Id*. ¶ 23.

5

Transactions on the terms and subject to the conditions set forth herein, (C) directing that the adoption of this Agreement be submitted to a vote at a meeting of the stockholders of the Company and (D) recommending that the stockholders of the Company adopt this Agreement ((A), (B), (C) and (D) being referred to herein as the "Company Board Recommendation"), which resolutions, as of the date of this Agreement, have *not been rescinded, modified or withdrawn in any way*.[20]

ETE's contention relies on interpreting the Agreement to mean that the public statements made by Williams, or Williams' Board of Directors (the "Directors" or the "Board"), constitute a withdrawal of the Company Board Recommendation or designation as a "Company Adverse Recommendation Change" under Section 4.02.[21] Williams argues that a proper construction of Section 4.02 allows for a "Company Adverse Recommendation Change" only in the context of a formal board resolution and that no such board resolution was enacted.[22] Section 4.02 reads in relevant part:

> (d) Neither the *Board of Directors of the Company nor any committee thereof* shall (i)(A) *withdraw (or modify or qualify in a manner adverse to [ETE])*, or *publicly propose* to withdraw (or modify or qualify in a manner adverse to [ETE]), the Company Board Recommendation or (B) recommend the approval or adoption of, or approve or adopt, declare advisable or publicly propose to recommend, approve, adopt or declare advisable, any Company Takeover Proposal (any action described in this clause (i) being referred to as a "Company Adverse Recommendation Change") or (ii) approve or recommend, or publicly

---

[20] Merger Agreement § 3.01(d) (emphases added).

[21] For ease of reference, any citation to a "section" refers to a section in the Merger Agreement, unless otherwise noted.

[22] Pl.'s Br. in Supp. of Its Mot. to Dismiss & to Strike Defs. & Countercl. Pls.' Second Am. & Supplemental Affirmative Defenses & Verified Countercl. ("Pl. Op. Br.") at 23–30; Nov. 30, 2016 Oral Arg. Tr. at 8:14–9:14.

propose to approve or recommend, or cause or permit the Company or any of its Subsidiaries to execute or enter into any Company Acquisition Agreement.

(f) Nothing contained in this Section 4.02 or elsewhere in this Agreement shall prohibit the Company or any of its Subsidiaries from (i) taking and disclosing to its stockholders a position contemplated by Rule 14d-9, Rule 14e-2(a) or Item 1012(a) of Regulation M-A promulgated under the Exchange Act or (ii) making any *disclosure to its stockholders* if the Board of Directors of the Company or any of its Subsidiaries determines in good faith (after consultation with and receiving advice of its outside legal counsel) that the failure to do so would reasonably be likely to constitute a breach of its fiduciary duties to its stockholders under applicable Law; provided, however, that any such action or statement or disclosure made pursuant to clause (i) or clause (ii) shall be deemed to be a Company Adverse Recommendation Change *unless the Board of Directors of the Company reaffirms its recommendation in favor of the Merger in such statement or disclosure or in connection with such action.*[23]

ETE contends that violations of the Company Adverse Recommendation provision in Section 4.02(d), which fall outside of the safe harbor in Section 4.02(f), are necessarily a violation of the reasonable best efforts provision in Section 5.03, and that Williams—by breaching Section 4.02(d)—is also in breach of Section 5.03.[24]

ETE also contends that violations of portions of Section 5.03 are "untethered to consummation of the Merger" and that such claims should remain even if the Merger

---

[23] Merger Agreement § 4.02(f) (emphases added).
[24] Countercl. ¶¶ 9, 32.

failed.[25]  As a result of these and other breaches, ETE seeks unspecified damages.[26]

ETE also argues that Williams' breach of the Company Adverse Recommendation provision in Section 4.02(d) allowed ETE to terminate the Agreement under Section 7.01(e), which permits termination by ETE "in the event that a Company Adverse Recommendation Change shall have occurred."[27] Therefore, Williams became immediately liable for a $1.48 billion fee (the "Company Termination Fee") under Section 5.06(d)(iii).[28]  Section 5.06(d)(iii) states that if the "Agreement is terminated by [ETE] pursuant to Section 7.01(e) [a Company Adverse Recommendation change], then . . . [Williams] shall pay [ETE] . . . an aggregate fee equal to $1.48 billion."[29]  Thus, according to ETE, Williams' breach of the Company Adverse Recommendation Change provision in Section 4.02(b) allowed ETE to terminate the Agreement under the permissible termination provision in Section 7.01(e), but then required Williams to pay a $1.48 billion Company Termination Fee under Section 5.06(d)(iii).[30]

---

[25] Defs. & Countercl. Pls.' Br. in Opp'n to Pl. and Countercl. Def.'s Mot. to Dismiss & to Strike Defs. and Countercl. Pls.' Second Amended & Supplemental Affirmative Defenses & Verified Countercl. ("Defs. Ans. Br.") 47–48.

[26] The damages sought other than the $1.48 billion Company Termination Fee are left unclear in the Counterclaim Complaint.  *See* Countercl. ¶¶ 32 ("By taking these actions, Williams breached Sections 4.01(b), 5.03, and 5.14 of the Merger Agreement, is not entitled to any post-termination relief, and is liable for damages."), 86 ("Williams has, therefore, violated Sections 4.02 and 5.03 of the Merger Agreement, owes ETE $1.48 billion, and is not entitled to any relief.").

[27] Merger Agreement § 7.01(e).

[28] *Id*. § 5.06(d)(iii).

[29] *Id*. § 5.06(d)(iii).

[30] Countercl. ¶ 51.

According to Williams, ETE could receive the $1.48 billion Termination Fee only if ETE "validly terminated the Agreement under Section 7.01(e) because the Williams Board effected a Company Adverse Recommendation Change."[31] Thus, Williams contends, to the extent that ETE maintains that violations of the reasonable best efforts clause in Section 5.01—or any other violations besides those under Section 7.01(e) and Section 5.06(d)(iii)—could lead to Williams paying the Company Termination Fee, those contentions are based on an inaccurate reading of the Merger Agreement.[32] Sections 5.06(b) and (c) specify the fees and expenses owed to the parties when the Agreement is terminated under other circumstances.[33] Williams argues that it does not owe ETE the $1.48 billion Termination Fee because it did not effect a Company Adverse Recommendation Change under the Agreement,[34] which is, according to Williams, the *only* way for Williams to owe ETE the $1.48 billion Termination Fee.

*D. The Forum Selection Clause*

ETE alleges that Williams' lawsuit against Warren in Texas for tortious interference with the Agreement (the "Texas Merger Action") violates the forum selection clause in Section 8.10(b) of the Merger Agreement.[35] Section 8.10(b)

---

[31] Pl.'s Reply Br. in Further Supp. of Its Mot. to Dismiss & to Strike Defs. and Countercl. Pls.' Second Am. & Supplemental Affirmative Defenses & Verified Countercl. at 6.
[32] Nov. 30, 2016 Oral Arg. 16:22–17:5.
[33] Merger Agreement §§ 5.06(b)–(c).
[34] Nov. 30, 2016 Oral Arg. Tr. 15:9–17:5.
[35] Countercl. ¶ 33.

9

states that:

> Each of the parties hereto irrevocably submits to the *exclusive jurisdiction of the Court of Chancery of the State of Delaware* for the purposes of any suit, action or other proceeding arising out of or relating to this Agreement and the rights and obligations hereunder or the Transactions or for the recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder or the Transactions.[36]

Williams contends that it did not breach the clause because it sued Warren in his personal capacity and Warren is not a party to the Merger Agreement.[37]  Regardless, argues Williams, any such breach was immaterial and therefore not subject to liability because Section 7.02 limits post-termination liability for everything except "*willful* and *material* breach[es] of any of its representations, warranties, covenants or agreements."[38]  Even if a breach were material, according to Williams, ETE suffered no cognizable damages.[39]  Alternatively, if there were damages, then Williams argues that recovery would be prohibited because Section 5.02(a) of the Agreement states that "all fees and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such fees or expenses, whether or not the Transactions are consummated."[40]

---

[36] Merger Agreement § 8.10(b) (emphasis added).
[37] Pl. Op. Br. at 52–53.
[38] Merger Agreement § 7.02 (emphases added).
[39] Pl. Op. Br. at 52.
[40] Merger Agreement § 5.06(a).

10

*E. The Additional Breach of Contract Claims*

ETE argues that Williams breached Section 5.01 of the Agreement by failing to disclose: (i) information about an internal proxy contest that may have influenced Williams' vote in approving the Agreement and for failing to promptly notify ETE of the same,[41] (ii) "the self-interests of the Williams Board and/or beliefs concerning those self-interests,"[42] and (iii) the "material fact that members of [Williams'] [B]oard considered the possibility of a board-member-led proxy contest when voting in favor of the [Merger]" in the Form S-4.[43] Williams argues that it disclosed the relevant facts and that, in any case, ETE "has pleaded (and can plead) no injury" from any disclosure violations.[44]

Section 5.01 pertains to the preparation of the Form S-4 and the proxy statement and states in pertinent part:

> (a) If at any time prior to receipt of the Company Stockholder Approval any information relating to [ETE] or the Company, or any of their respective Affiliates, directors or officers, should be discovered by [ETE] or the Company which is required to be set forth in an amendment or supplement to either the Form S-4 or the Proxy Statement, so that either such document would *not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading*, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information

---

[41] Countercl. ¶ 29.
[42] *Id*. ¶ 130.
[43] *Id*. ¶ 112.
[44] Pl. Op. Br. at 42–48.

11

shall be promptly filed with the SEC and, to the extent required by Law, disseminated to the stockholders of the Company.[45]

The success of ETE's allegations rest on whether I find that these omissions are material and, if material, resulted in compensable damages.

ETE further alleges that Williams breached Sections 4.01(b) (carrying on business in the ordinary course), 5.03 (reasonable best efforts), and 5.14 (reasonable cooperation in financing arrangements) of the Agreement by refusing to provide the information required—including certain financial information and a consent from Williams' auditor to include its audit reports related to that financial information—for ETE to file a Form S-3 and complete a public equity offering.[46] ETE's contention is that Williams' obligation to not unreasonably withhold consent for ETE to "carry on its business in the ordinary course" under Section 4.01(b), combined with the Letter Agreement's allowance for "issuances of equity securities with a value of up to $1.0 billion in the aggregate,"[47] should be read together to mean that a proposed issuance, by which ETE intended to finance the Merger in part, was allowable. Williams' consent was improperly withheld, placing Williams in breach of Section 4.01(b).[48] ETE alleges that this violation also breaches the reasonable best efforts provision in Section 5.03 and a provision requiring cooperation in

---

[45] Merger Agreement § 5.01(a) (emphasis added).
[46] Countercl. ¶¶ 31–32.
[47] *Id.* ¶ 154.
[48] *Id.* ¶¶ 148–56.

12

financing arrangements in Section 5.14.[49]  Williams argues that Section 5.14 was not triggered because its consent was not *unreasonably* withheld.[50]  Section 5.14 states in relevant part:

> Prior to the Effective Time, the Company shall, and shall cause its Subsidiaries and their respective Representatives to, provide cooperation *reasonably requested* by [ETE] that is necessary or *reasonably required* in connection with the Financing or any other financing that may be arranged by [ETE].[51]

The viability of these contentions depends on my finding that Williams' consent was withheld improperly and that any such withholding of consent caused injury to ETE.

In addition, Williams argues that alleged violations of Section 5.01(b)—which pertains to preparing the Form S-4 and the proxy statement—did not result in damages to *ETE*.  Section 5.06 states in pertinent part:

> (b) If this Agreement is terminated (i) by either the Company or [ETE] pursuant to Section 7.01(b)(iii) or (ii) by [ETE] pursuant to Section 7.01(c), then in each case of clauses (i) and (ii) the Company shall promptly upon written demand by [ETE] (and in any event no later than two business days after such written demand is delivered to the Company) reimburse [ETE], by wire transfer of same day federal funds to the account specified by [ETE], for *all out-of-pocket fees and expenses incurred or paid by or on behalf of* [ETE] or their respective Subsidiaries and Affiliates in connection with the Merger or related to the preparation, negotiation, execution and performance of this Agreement, the Commitment Letter, the Fee Letter and related transaction documents, including *all fees and expenses of counsel,*

---

[49] *Id*. ¶¶ 32, 136; Merger Agreement §§ 4.01(b), 5.03, 5.14.
[50] Pl. Op. Br. at 48–52.
[51] Merger Agreement § 5.14 (emphases added).

13

financial advisors, accountants, experts and consultants retained by [ETE] or their respective Subsidiaries and Affiliates, such amount *not to exceed $50.0 million* in the case of clause (i) and *$100.0 million* in the case of clause (ii).

(c) If this Agreement is terminated by the Company pursuant to Section 7.01(d), then [ETE] shall promptly upon written demand by the Company (and in any event no later than two business days after such written demand is delivered to [ETE]) *reimburse the Company*, by wire transfer of same day federal funds to the account specified by the Company, for all out-of-pocket fees and expenses incurred or paid by or on behalf of the Company or its Subsidiaries and Affiliates in connection with the Merger or related to the preparation, negotiation, execution and performance of this Agreement and related transaction documents, including *all fees and expenses of counsel*, financial advisors, accountants, experts and consultants retained by the Company or its Subsidiaries and Affiliates, such *amount not to exceed $100.0 million*.[52]

## II. ANALYSIS

The Counterclaim Defendants have moved to dismiss the counterclaims under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[53]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[54] In addition,

---

[52] Merger Agreement §§ 5.06(b)–(c).
[53] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).
[54] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

14

I refer to certain documents and public filings that are incorporated by reference in the Counterclaim Complaint.[55]

*A. The Board Recommendation Claim*

The most serious contention in the ETE counterclaims—from a damages perspective, at least—is that Williams violated its contractual obligations regarding the Board Recommendation in favor of the Merger, after which ETE terminated the Agreement, triggering an obligation on Williams' part to pay ETE a $1.48 billion Termination Fee. ETE seeks specific performance of this provision.

The syllogism under which ETE seeks the Termination Fee is rather complicated. First, ETE points out that under Section 3.01(d)(1), the Williams' Board of Directors is required to cause the Company to adopt resolutions (a) approving the Merger; (b) declaring that the Merger is in the best interest of its stockholders; (c) directing a stockholder vote; and (d) recommending that the stockholders adopt the Merger Agreement in that vote. Resolutions comprising (a), (b), (c) and (d) are defined as the "Company Board Recommendation."[56] All parties agree that the Williams's Board initially complied with the Merger Agreement by making this required Company Board Recommendation. Second, ETE points out that Section 4.02(d)(i)(A) provides that neither Williams' Board, "nor any

---

[55] *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).
[56] Merger Agreement § 3.01(d).

committee thereof," shall "withdraw (or modify or qualify in a manner adverse to [ETE], or publicly propose to withdraw, or modify or qualify in a manner adverse to [Williams], the Company Board Recommendation."[57] ETE argues that, even though the Williams Directors did not formally withdraw the Company Board Recommendation, the Directors informally decided (in light of ETE's perceived disinclination to merge) that it was more lucrative to Williams to pursue negotiation of a walk-away payment from ETE than to consummate the Merger. Third, ETE contends that, in pursuit of the strategy just described, the Company took the following actions during the pendency of the Merger: it (1) issued press releases that signaled Williams' pessimism about the Merger to the market; (2) sued ETE CEO Kelcy Warren in Texas state court and used the pleadings to damage investor confidence in Warren; (3) used the media to portray ETE in a negative light; and (4) released a Form S-4 that undermined the financial projections used to initially recommend the Merger to Williams' stockholders. The actions described above, according to ETE, amount to a *de facto* "withdrawal" of the Company Board Recommendation sufficient to qualify as a breach of Section 4.02(d). Fourth, after that breach, ETE exercised its right to terminate the Merger. Fifth, and finally, under the remedies described in Section 5.06 of the Merger Agreement, termination in this scenario entitles ETE to the Termination Fee.

---

[57] *Id*. § 4.02(d)(i)(A).

ETE presses this argument despite the following undisputed facts: 1) Williams sued ETE to specifically enforce consummation of the Merger, which ETE strenuously (and successfully) opposed; 2) notwithstanding the supposed *de facto* withdrawal of the Company Board Recommendation in favor of the Merger, Williams' Directors never acted formally to withdraw the resolutions; 3) the Board affirmed the Company Board Recommendation several times during the pendency of the Merger; 4) an overwhelming majority of Williams' stock was voted in favor of the Merger, after which ETE—not Williams—terminated the Merger *upon failure of a condition precedent.*

Williams notes that ETE did not purport to terminate the Merger based on breach of the Company Board Recommendation provision; instead, it relied on the failure of the tax opinion to avoid the deal. Williams then makes the common-sense observation that it would be passing strange for two parties to a merger agreement to structure the agreement so that a party which desired to exit the agreement could do so, over the other party's objections, and at the same time receive the windfall of a substantial termination fee. ETE does not suggest that it is *not* seeking a windfall in the form of the Termination Fee; it simply notes that Delaware is a contractarian state that leaves parties to the benefits of their bargains, good, bad, and indifferent. ETE argues that Williams breached its duty not to modify the Company Board Recommendation, after which breach ETE terminated the Merger, thereby

17

qualifying for the $1.48 billion Termination Fee. Accordingly, ETE asserts that if it is entitled to the Termination Fee under the negotiated terms of the Agreement, our Courts will enforce the contract, windfall or no. ETE is correct in noting that this is a contractarian jurisdiction;[58] however, I find the contract language, as written, fatal to ETE's contention here.

That is because the Agreement itself carefully defines the Company Board Recommendation as a series of four recommendations to be made, via board resolution, by the Williams' Directors. It is undisputed that the Williams Board created, via resolutions, a contractually compliant Company Board Recommendation. There are no allegations in the Counterclaim Complaint that the Directors, or any subcommittee thereof, ever formally modified (or expressed the intent to so modify) the Recommendation. In fact, the Recommendation remained in place through the vote on the Merger, which was overwhelmingly approved by Williams' stockholders. ETE, therefore, received what it bargained for. ETE has not alleged facts which make it reasonably conceivable that the Board withdrew the Recommendation.

ETE's argument is really that the Board adopted a strategy under which the

---

[58] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1075 (Del. Ch.), *aff'd*, 68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012) ("I conclude that . . . consistent with Delaware's pro-contractarian public policy, the parties' agreement . . . should be entitled to specific performance and injunctive relief should be respected.").

Company took a number of actions which ETE deems inimical to consummation of the merger. As will be discussed below, those efforts may be contractually meaningful in terms of the "best efforts" requirement that the Merger Agreement imposed on Williams. However, the Agreement was careful to cabin ETE's entitlement to the Termination Fee to those situations in which Board (or subcommittee) action modified (or proposed to modify) the required Company Board Recommendation, after which ETE terminated the Merger.

Because I find the Merger Agreement sections discussed to be clear on their face, I will not discuss further the parties' various attempts to construe those provisions in light of other provisions in the Agreement. Suffice it to say that ETE's reference to other contract provisions, attempting to demonstrate that the plain reading of the sections I have described above is incompatible with the balance of the Merger Agreement, I find unconvincing.

*B. The Forum Selection Clause*

During the pendency of the Merger, Williams brought an action against Kelcy Warren, ETE's principal, in Texas. The parties dispute the motive behind the litigation, which involved ETE's issuance of equity in ETE to insiders. The purpose for that issuance is itself disputed. Williams characterizes the Texas litigation as in aid of consummation of the Merger; ETE characterizes it as posturing in favor of Williams' negotiating a payment from ETE in return for Williams' consent to

terminate the merger. In any event, ETE argues that the Texas litigation violated Section 8.10(b), which provides that no party shall bring "actions relating to this Agreement or the Transactions in any court other than the [Court of Chancery]" and that each such party "irrevocably submits with regard to any such action or proceeding . . . generally and unconditionally, to the personal jurisdiction of the aforesaid courts."[59] According to ETE, the Texas court dismissed the suit for violating the forum selection clause in Section 8.01(b) of the Merger Agreement.[60] ETE seeks damages here, which it describes as the fees and costs of the Texas action, arising from breach of the forum selection clause.

The parties argue forcefully about whether Warren was a party to the Merger Agreement, and thus whether Section 8.01(b) applied to the Texas action, and whether this Court had jurisdiction over Warren under the terms of the Merger Agreement. Even if I assume that ETE has the best of that argument, and that ETE is the proper party to seek as damages fees and costs incurred in a suit against Warren in his personal capacity, ETE cannot recover those fees and costs here, because Section 5.06(a) of the Agreement is, in that case, dispositive. That Section provides that "all fees and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such fees or expenses, whether or

---

[59] Merger Agreement § 8.10(b).
[60] Defs. Ans. Br. 16.

not the Transactions are consummated."[61]  In adopting that language, the parties waived any right to receive fees and expenses for a breach of the Agreement—if a breach it was—of the type ETE describes here.

I note that in addition to fees and costs, ETE argues that it suffered other damages in connection with the representations made by Williams in the Texas litigation, violating Merger Agreement provisions *independent* of the forum selection clause.  Those damages claims are incorporated in the discussion below.

*C. The Additional Breach of Contract Claims*

Aside from its arguments concerning the Termination Fee and breach of the forum selection clause, ETE alleges other supposed breaches of the Agreement by Williams.

ETE argues that, as market conditions changed, the Williams' Board failed to obtain an updated fairness opinion from its financial advisors and failed to make disclosures to its stockholders concerning changes in market conditions.  In addition, ETE contends that Williams' disclosures were materially incomplete concerning its reasons for agreeing to the Merger in the first instance.  According to ETE, those include the threat of a proxy fight or consent solicitation—which caused some Williams Directors to change their vote to favor the Merger—that was inadequately disclosed.  ETE next alleges that Williams failed to disclose various self-interests of

---

[61] Merger Agreement § 5.06(a).

Williams' Directors.  Also, ETE alleges that Williams failed to update its Form S-4 to reflect that at least one of the potential proxy contests could have been led by at a sitting Williams' Board member, which according to ETE, influenced the other Directors' votes in the Merger. These disclosures, according to ETE, would have been material to stockholders in making an informed vote concerning the Merger. The disclosures—in addition to being required under common law—were required under Section 5.01 of the Agreement.

Whether Williams' Board breached duties to its stockholders either under common law or the Agreement is a question of fact.  Here, however, ETE seeks its own damages under the Agreement.  While failure of material disclosures may have posed a threat of damages to the combined entity if the Merger had been consummated, the Merger was in fact terminated by ETE.  Damages are an element of a breach of contract action.[62]  It is simply not reasonably conceivable that any breach of the Williams Directors' responsibility to obtain an updated fairness opinion[63] or make required disclosures to Williams stockholders could lead to damages to ETE, in light of the failure of the Merger.  Therefore, the Motion to Dismiss must be granted with respect to this issue.

---

[62] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.").

[63] I make no finding here that Williams was under a common law obligation to obtain an updated fairness opinion, as a duty to its stockholders.

Next, ETE notes that Williams failed to consent to a nearly $1 billion public offering, by which ETE intended to finance, in part, the Merger. ETE argues that Williams had a responsibility to cooperate with this equity financing, which required Williams to submit certain financial information and a consent from Williams' auditor to include certain audit reports related to that financial information. According to Williams, the public offering was discriminatory to Williams' stockholders, and it had a proper business purpose for withholding its consent. As noted above, I have another action pending[64] concerning this Special Issuance and its effect on other non-participating stockholders. The contractual language regarding Williams' obligation in this situation is not clear to me, and my analysis would benefit from extrinsic evidence regarding that obligation. A more serious question is whether damages can flow from any breach, given that ETE terminated the Agreement for failure of the unrelated condition precedent regarding tax consequences. ETE also argues that Williams failed to use best efforts to consummate the Merger as required by the Merger Agreement. To the extent that ETE can prove such, again, damages are problematic. However, we are at the motion to dismiss phase of this litigation. ETE argues that its willingness to exercise its option to terminate the Merger Agreement, based on the failure of the condition precedent, was informed by the results of Williams' breach of the obligation to

---

[64] *See ETE Unitholder Litig.*, 2017 WL 782495, at *1.

approve the equity offering and failure of best efforts. It seeks, at a minimum, to offset Williams' own damages claims accordingly. While I am dubious that ETE will ultimately prevail in demonstrating that Williams breached the Agreement in this regard, and that damages flowed as a result, such an outcome is reasonably conceivable. Therefore, resolution of these issues awaits a developed record and the Motion to Dismiss this claim is denied.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Dismiss the counterclaims is granted in part and denied in part. I note that Williams has a motion outstanding to strike ETE's affirmative defenses, which rest on the same allegations as do the counterclaims. The parties should consult and inform me whether any portion of that Motion to Strike needs further judicial resolution. The parties should also provide a Form of Order consistent with this Memorandum Opinion.