# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ZENITH ENERGY TERMINALS | ) | |
| JOLIET HOLDINGS LLC, a Delaware | ) | |
| Limited Liability Company, JOLIET | ) | |
| BULK, BARGE & RAIL LLC, a | ) | |
| Delaware Limited Liability Company, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.: N19C-10-054 EMD CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| CENTERPOINT PROPERTIES TRUST, | ) | |
| a Maryland Real Estate Investment Trust, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: October 28, 2022
Decided: January 23, 2023

*Upon the Motion of Plaintiffs Zenith Energy Terminals Joliet Holdings, LLC and Joliet Bulk,*
*Barge & Rail LLC for Summary Judgment*
***DENIED***
*Upon Defendant CenterPoint Trust's Motion for Summary Judgment*
***DENIED***

Christopher Viceconte, Esquire, Gibbons P.C., Wilmington, Delaware, Patrick J. Lamb, Esquire, J'Aimee Crockett, Esquire, ElevateNext Law, Chicago, Illinois. *Attorneys for Plaintiffs Zenith Energy Terminals Joliet Holdings LLC and Joliet Bulk, Barge & Rail LLC.*

F. Troupe Mickler IV, Esquire, Randall J. Teti, Esquire, Ashby & Geddes, P.A., Wilmington, Delaware, James D. Dasso, Esquire, Jennifer S. Park, Esquire, Mason D. Roberts, Esquire, Foley & Lardner LLP, Chicago, Illinois. *Attorneys for Defendant CenterPoint Properties Trust.*

**DAVIS, J.**

## I. INTRODUCTION

This is a breach of contract action assigned to the Complex Commercial Litigation

Division of this Court. Plaintiffs Zenith Energy Terminals Joliet Holdings LLC ("Zenith") and

Joliet Bulk, Barge & Rail LLC ("JBBR") (collectively, "Zenith" or the "Plaintiffs") filed an

Amended Complaint on September 10, 2021, against Defendants CenterPoint Properties Trust ("CenterPoint" or the "Defendant") for breach of contract.[1]

CenterPoint previously owned JBBR.[2] CenterPoint, through JBBR, entered into contracts to design and build a crude-by-rail off-loading terminal in Joliet, Illinois (the "Terminal").[3] CenterPoint planned that the Terminal would receive, off-load, store, and distribute crude oil from the Mojo Pipeline.[4]

CenterPoint and Arc Terminals Joliet Holdings LLC (now known as Zenith Terminals Joliet Holdings LLC) entered into a Membership Interest Purchase Agreement (the "Purchase Agreement").[5] Under the Purchase Agreement, CenterPoint sold JBBR and, in effect, the Terminal to Zenith before the construction project on the Terminal was completed.[6] Thereafter, Zenith, on behalf of JBBR, and CenterPoint negotiated a Construction Management Agreement, whereby CenterPoint was to continue to manage the construction project.[7] Ultimately, the construction project was incomplete, not meeting alleged key requirements under the design and build plans.[8]

Zenith filed suit, believing CenterPoint breached the Purchase Agreement and the Construction Management Agreement. CenterPoint believes no such breaches occurred. The parties filed cross-motions for summary judgment: (i) Motion of Plaintiffs Zenith Energy Terminals Joliet Holdings, LLC and Joliet Bulk, Barge & Rail LLC for Summary Judgment (the "Zenith Motion"); and (ii) Defendant CenterPoint Trust's Motion for Summary Judgment (the

---

[1] Amended Complaint ("Am. Compl."), Sept. 10, 2021 (D.I. 89).
[2] *See id.* ¶ 4.
[3] *Id.* ¶ 3.
[4] *Id.* ¶ 1.
[5] *Id.* ¶ 4.
[6] *Id.*
[7] *Id.* ¶¶ 4-5.
[8] *Id.* ¶ 6.

2

"CenterPoint Motion"). For the reasons set forth below, the Court is **DENYING** both the Zenith Motion and the CenterPoint Motion.

## II. RELEVANT FACTS

### A. THE PARTIES

"Zenith Energy Terminals Joliet Holdings LLC is a Delaware limited liability company formerly named Arc Terminals Joliet Holdings LLC."[9] Arc Terminals contracted with CenterPoint under the Purchase Agreement to purchase JBBR.[10] As stated above, JBBR controls the Terminal.

CenterPoint is a "Maryland real estate investment trust" that "acquires, develops, manages and leases warehouse, distribution and manufacturing facilities near major transportation nodes and is an expert in large rail infrastructure assets."[11] CenterPoint was the owner of the Terminal prior to the execution of the Purchase Agreement.[12] Additionally, CenterPoint managed the continuing construction of the Terminal post-sale under the Construction Management Agreement.[13]

JBBR is a Delaware limited liability company formed by CenterPoint on or around November 9, 2011.[14] CenterPoint, through JBBR, negotiated contracts to design and construct the Terminal.[15] JBBR has owned the Terminal and, by extension, the construction project at all

---

[9] *Id.* ¶ 8. Hereafter, Arc Terminals Joliet Holdings LLC will be defined as "Arc Terminals."
[10] *Id.*
[11] *Id.* ¶ 10.
[12] *Id.* ¶¶ 2-4; *see also* Plaintiffs' Motion for Summary Judgment ("Pls.' Mot. for Summ. J.") at 2, Aug 5, 2022 (D.I. 131).
[13] Am. Compl. ¶ 4.
[14] *Id.* ¶ 9; Pls.' Mot. for Summ. J. at 2.
[15] Pls.' Mot. for Summ. J. at 3; Defendant's Motion for Summary Judgment ("Def.'s Mot. for Summ. J.") at 5, Aug. 5, 2022 (D.I. 139).

relevant times.[16]  On May 14, 2015, CenterPoint sold JBBR to Zenith (still known as Arc

Terminals at the time) under the Purchase Agreement.[17]

There are two additional relevant non-parties—Wilson & Company, Inc. Engineers &

Architects ("Wilson") and Ragnar Benson Construction LLC ("Ragnar").  On April 16, 2014,

Wilson and JBBR entered into a Master Services Agreement ("MSA").[18]  The MSA tasked

Wilson with providing design, engineering, and construction oversight on the construction

project.[19]  Additionally, Wilson entered into various task orders that provided details on the

scope of work for the construction project.[20]  On August 26, 2014, Ragnar and JBBR entered

into a Construction Contract, where Ragnar was assigned to be the engineering, procurement,

and construction contractor on the construction project.[21]  Ragnar purportedly "agreed to

construct the Terminal in conformity with [s]pecifications and the provisions of the Construction

Contract."[22]

## B.  THE PURCHASE AGREEMENT AND THE CONSTRUCTION CONTRACT

In 2014, while the Terminal was under construction, CenterPoint began negotiations with

Arc Terminals (later known as Zenith) regarding the sale of JBBR.[23]  Zenith sought to acquire

JBBR because there was a guaranteed cash flow associated with the Terminal.[24]  On February

19, 2015, Zenith and CenterPoint entered into the Purchase Agreement.  Zenith purchased JBBR

from CenterPoint for $216 million, plus $27 million in deferred payments, for an aggregate

---

[16] Am. Compl. ¶ 9.
[17] Def.'s Mot. for Summ. J. at 5; Am. Compl. ¶ 11.
[18] Am. Compl. ¶ 12, Ex. C (MSA).
[19] *Id.*
[20] *Id.* ¶ 12.
[21] *Id.* ¶ 13, Ex. E (Construction Agreement), Ex. G (laying out the "Scope of Work & Specifications").
[22] Def.'s Mot. for Summ. J. at 8-9.
[23] Pls.' Mot. for Summ. J. at 5.
[24] *Id.*

amount of $243 million.[25]  Because Zenith was allegedly unwilling to assume responsibility for completion of the Terminal, the parties agreed that CenterPoint would "see the project through to completion."[26]  The parties memorialized this in Section 6.15(a) of the Purchase Agreement, titled "Final Completion," which states:

> After Closing, on and subject to the terms of the Construction Contract [with Ragnar] and the Construction Management Agreement, [CenterPoint] shall use its *reasonable best efforts* to achieve, and to cause the EPC Contractor [Ragnar] (and any other applicable third party contractors or service providers) to achieve, Final Completion in accordance with the Approved Cost Plan and the Project Schedule and otherwise in accordance with the terms and conditions of the Construction Contract and the Construction Management Agreement in all material respects.[27]

In the Purchase Agreement, "Final Completion" is defined as "the meaning given in the Construction Contract."[28]  The Construction Contract between JBBR and Ragnar, dated August 26, 2014, defines "Final Completion" as:

> [T]hat point in time in the progress of the Work after Mechanical Completion when (a) the Work has been completed and is operational; (b) all testing (including hydrotesting) and coating is complete; (c) all pipe, valves, and Equipment installation and tie-ins are complete; (d) all essential Equipment and lines have been hydrotested and had a geometry tool run through them; (e) the Work is capable of transporting refined products in a safe uninterrupted manner 24 hours per day, seven days per week without further anticipated shutdowns, except for preventative maintenance; (f) and all other requirements of this [Construction Contract] with respect to Final Completion ([including those set forth in Construction Contract Exhibit A]) have been satisfied.[29]

Exhibit A of the Construction Contract sets out the "Minimum Requirements for Final Completion" and defines them as:

> (a) Final Completion includes, at a minimum, the following: (i) any liquidated damages payable by [Ragnar] to [JBBR] pursuant to th[is Construction Contract]

---

[25] Am. Compl. ¶ 4.

[26] Pls.' Mot. for Summ. J. at 6

[27] *Id.*, Ex. N (Purchase Agreement) § 6.15(a) (emphasis added).

[28] *Id.*, Ex. N at Annex I.

[29] Am. Compl., Ex. E (Construction Contract) § 1.1; *see also id.* ("'Work' shall mean all of [Ragnar's] obligations, duties and responsibilities under this [Construction Contract], including the design, engineering, procurement, manufacturing, supply, installation, erection, construction, commissioning, and testing of the Facilities, all work and services described in Exhibit A and all Warranty Work.") (underlining in original).

have been paid and/or satisfied; (ii) [Ragnar] has completed all the Work required by this [Construction Contract]; (iii) [Ragnar] has executed and delivered to [JBBR] and [JBBR] has accepted the lien waiver . . .; (iv) [Ragnar] has provided the final close-out report to [JBBR]; (v) there are no outstanding claims or disputes as between [Ragnar and JBBR]; and (vi) [administrative].[30]

On May 14, 2015, the parties closed the sale of JBBR to Zenith, and Zenith became JBBR's parent company.[31]  Additionally, as part of the closing, Zenith, on behalf of JBBR, and CenterPoint executed the Construction Management Agreement on May 14, 2015.[32]

## C. THE CONSTRUCTION MANAGEMENT AGREEMENT

In tandem with the Purchase Agreement, Zenith and CenterPoint executed the Construction Management Agreement.[33]  The Construction Management Agreement made CenterPoint the agent of JBBR,[34] and it states that "[JBBR] has requested that [CenterPoint] provide certain construction management services to [JBBR] . . . for a limited period following the Closing Date, and [CenterPoint] has agreed to provide such services."[35]

The Zenith Motion and the CenterPoint Motion rely on certain sections of the Construction Management Agreement.  The motions both reference Section 2(a), titled "Construction Management Services," which states:

> Subject to the terms of this Agreement, [CenterPoint] agrees to provide to [JBBR] and [JBBR] agrees to accept from [CenterPoint], the construction management services described on Schedule A . . .. [JBBR] hereby (i) [appoints CenterPoint as its agent for all purposes] under the Construction Contract [and CenterPoint accepts], and (ii) authorizes [CenterPoint] to take all actions on behalf of [JBBR] that [CenterPoint], in [CenterPoint]'s sole and good faith discretion, considers reasonably necessary to provide the Services, including all invoices, payments, change orders and certifications under the Construction Contract; provided that [CenterPoint] shall (A) obtain [JBBR]'s prior written consent (which shall not be unreasonably withheld, conditioned or delayed) before (1) issuing the Final

---

[30] *Id.*, Ex. E at Exhibit A to Construction Contract.
[31] Pls.' Mot. for Summ. J. at 11; Def.'s Mot. for Summ. J. at 5.
[32] Def.'s Mot. for Summ. J. at 19.
[33] *See* Am. Compl., Ex. B (Construction Management Agreement).
[34] *See id.* ¶ 34.
[35] *Id.*, Ex. B at Recitals.

Completion Certificate (as defined in the Construction Contract) and making payment therefor.[36]

Construction Management Agreement Schedule A states that "[CenterPoint] shall manage EPC Contractor's [Ragnar's] performance and completion of the Work under the Construction Contract until the Final Completion Certificate is issued and accepted by [JBBR] thereunder and payment is made therefor."[37]

Construction Management Section 2(b) is also referenced. Section 2(b) provides:

[CenterPoint] shall perform the Services with substantially the same standard of care (including quality) as the Services were performed by or on behalf of [JBBR] prior to the Effective Date, including, without limitation, by performing the Services, at all times, as would a reasonably prudent construction manager in the construction management industry.[38]

Construction Management Agreement Section 2(h) limits the obligations under Section 2, and it provides that "except as expressly set forth in Section 2, no representations, warranties or guaranties of any kind, express or implied . . . are made by [CenterPoint] with respect to the services provided under [the Construction Management Agreement]," and that all representations and warranties are waived and disclaimed to the fullest extent of the law.[39]

### D. EVENTS AFTER EXECUTION OF THE AGREEMENTS AT THE TERMINAL

On May 19, 2015, CenterPoint sent Ragnar's "punchlist" to Zenith's Terminal manager, Doug Haduch.[40] The "punchlist" was a "list of all of the items on a particular contract that need to be addressed before the project is completed."[41] Originally, the punchlist contained more than seventy (70) items, but, by September 4, 2015, only six remained.[42] On October 16, 2015,

---

[36] *Id.*, Ex. B § 2(a) (underlining in original).
[37] *Id.*, Ex. B at Schedule A.
[38] *Id.*, Ex. B § 2(b).
[39] *Id.*, Ex. B § 2(h).
[40] Def.'s Mot. for Summ. J. at 20.
[41] *Id.*
[42] *Id.* at 20-21.

7

Ragnar contacted CenterPoint, JBBR's agent pursuant to the Construction Management Agreement, and requested the issuance of a Final Completion Certificate.[43] CenterPoint forwarded the request to JBBR and Zenith the same day.[44]

On October 29, 2015, JBBR denied Ragnar's request to issue a Final Completion Certificate.[45] Construction Contract Section 12.3 required JBBR to "list[] the items of Work that remain to be completed, remedied or reperformed before Final Completion is achieved."[46] On October 29, 2019, and in compliance with Section 12.3, JBBR notified CenterPoint and Ragnar that only three (3) of six (6) railcar-unloading pumps operated simultaneously, whereas the Work required five (5) of six (6) to operate.[47] Ragnar agreed to address the unloading deficiencies.[48]

In February 2016, "efforts were made to test/commission the unloading system when the weather was sufficiently cold and rail cars with crude oil were delivered to the facility."[49] On February 24, 2016, Ragnar monitored the unloading of rail cars and determined all pumps "met or exceeded all performance[] specifications" and requested a Final Completion Certificate.[50] Zenith states that during the February testing, JBBR "discovered additional deficiencies with the steam/condensate and hot oil systems" and on March 7, 2016, notified Ragnar that these deficiencies precluded achievement of Final Completion.[51] Zenith also states there were additional deficiencies regarding: non-conforming boilers, inadequate steam traps, improper valves, lack of hydraulic analysis, among other alleged deficiencies.[52] It appears that from

---

[43] Pls.' Mot. for Summ. J. at 11; Def.'s Mot. for Summ. J. at 21.
[44] Def.'s Mot. for Summ. J. at 21.
[45] Pls.' Mot. for Summ. J. at 12-13, Ex. T at 8-10.
[46] Am. Compl., Ex. E § 12.3(b).
[47] Def.'s Mot. for Summ. J., Ex. 28 (Final Completion Rejection from JBBR to CenterPoint).
[48] Pls.' Mot. for Summ. J. at 13.
[49] *Id.*
[50] Def.'s Mot. for Summ. J. at 22, Ex. 29
[51] Pls.' Mot. for Summ. J. at 13, Ex. T at 28 (Letter from JBBR to Ragnar, dated March 7, 2016).
[52] *Id.* at 14-16.

8

around December 2016 through January 2017 there were attempts to fix these deficiencies.[53]

However, they were not resolved.[54]

By February 2017, Zenith says "CenterPoint abandoned all efforts to obtain Final Completion."[55] CenterPoint counters and states that the letter Zenith relies on to make that claim actually "confirms CenterPoint's intention to continue to comply with its obligations."[56] In March 2017, Zenith hired the engineering firm, Ambitech, "to diagnose the deficiencies with the [Terminal] and undertake mitigation/remediation efforts."[57] Ambitech found deficiencies.[58] In essence, these deficiencies related to the Terminal's alleged inability to operate in cold weather, and the failure to engage in allegedly required testing procedures.[59] Zenith admits that these "deficiencies resulted from the failures of Wilson and Ragnar," but Zenith also believes "CenterPoint . . . was responsible under the [Construction Management Agreement] for the [Terminal] reaching Final Completion."[60]

### E. RELATED LITIGATION

On January 23, 2017, Ragnar filed a lawsuit against JBBR in Will County, Illinois seeking $992,990.40 (the "Illinois Action").[61] Ragnar seeks payment due upon Final Completion under the Construction Contract.[62] JBBR filed a counterclaim against Ragnar for

---

[53] *Id.*, Ex. T at 137-51
[54] *Id.* at 17.
[55] *Id.*
[56] Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n") at 28-29, Sept. 6, 2022 (D.I. 145); *see also* Pls.' Mot. for Summ. J., Ex. T at 152-53. This is a letter from CenterPoint to JBBR, in which CenterPoint states "[CenterPoint] would also ask [JBBR] to consider whether [JBBR is] acting reasonably in withholding and conditioning consent to the issuance of the Final Completion Certificate [based on the enumerated issues]." Pls.' Mot. for Summ. J., Ex. T at 152. The same letter also kept lines of communication open. *See id.* ("If [JBBR] would like to discuss the matter further, please feel free to contact [CenterPoint].").
[57] Pls.' Mot. for Summ. J. at 17; *see also id.*, Ex. Y (Ambitech Engagement Report).
[58] *Id.* at 17-18; *see also id.*, Ex. Y.
[59] *Id.* at 19-22.
[60] *Id.* at 18.
[61] Am. Compl. ¶ 49; Def.'s Mot. for Summ. J. at 23.
[62] Def.'s Mot. for Summ. J. at 23.

breach of the Construction Contract.[63]  On July 23, 2017, JBBR filed a third-party complaint against Wilson for breach of the MSA (Master Services Agreement).[64]

## F. THIS LITIGATION

On October 7, 2019, Zenith filed its original Complaint, asserting (1) breach of contract against CenterPoint under the Purchase Agreement between Zenith and CenterPoint, and (2) breach of contract against CenterPoint under the Construction Management Agreement between JBBR and CenterPoint.[65]  On November 9, 2019, CenterPoint filed its first Motion to Dismiss, or, in the Alternative, Motion to Stay the Action Pending Resolution of the Related Litigation (the Motion to Dismiss").[66]  On January 28, 2020, the Court heard argument on the Motion to Dismiss.[67]  On February 14, 2020, the Court denied the Motion to Dismiss.[68]  On February 21, 2020, CenterPoint filed its Answer and Affirmative Defenses.[69]

On August 27, 2021, Zenith filed a Motion to Amend the Complaint under Delaware Superior Court Civil Rule 15(a),[70] which the Court granted on September 9, 2021.[71]  Zenith filed the current Amended Complaint on September 10, 2021, which asserts the same two breach of contract counts as the original Complaint.[72]  CenterPoint thereafter filed its Answer and Affirmative Defenses on September 24, 2021.[73]  CenterPoint then filed a Motion to Amend the Answer (the "Motion to Amend") to assert counterclaims on the same day.[74]  The Court heard

---

[63] Am. Compl. ¶ 49 (noting the filing occurred on April 26, 2017); Def.'s Mot. for Summ. J. at 23 (noting the filing occurred on March 23, 2017).
[64] Am. Compl. ¶ 49; Def.'s Mot. for Summ. J. at 23.
[65] *See* Original Complaint ("Original Compl."), Oct. 7, 2019 (D.I. 1).
[66] *See* Defendant's First Motion to Dismiss ("First Mot. to Dismiss"), Nov. 19, 2019 (D.I. 9).
[67] *See* Judicial Action Form, Jan. 28, 2020 (D.I. 25).
[68] *See* Order, Feb. 14, 2020 (D.I. 27).
[69] *See* Answer, Feb. 21, 2020 (D.I. 28).
[70] *See* Motion to Amend Complaint, Aug. 27, 2021 (D.I. 86).
[71] Order, Sept. 9, 2021 (D.I. 88).
[72] *See* Am. Compl.
[73] *See* Answer, Sept. 24, 2021 (D.I. 90).
[74] *See* Motion to Amend Answer, Sept. 24, 2021 (D.I. 91).

argument on the Motion to Amend on October 18, 2021,[75] and denied the Motion to Amend on January 7, 2022.[76]

On August 5, 2022, Zenith filed the Zenith Motion, seeking judgment in its favor on both counts as it relates to liability and requesting a trial as to damages.[77]  Also on August 5, 2022, CenterPoint filed the CenterPoint Motion, requesting judgment in its favor on both counts in the Amended Complaint.[78]  The Court heard argument on the Zenith Motion and the CenterPoint Motion on October 28, 2022.  At the end of the hearing, the Court took the motions under advisement.

## III.    PARTIES' CONTENTIONS

### A. THE ZENITH MOTION

Zenith seeks summary judgment on Count I (breach of the Purchase Agreement between Zenith and CenterPoint) and Count II (breach of the Construction Management Agreement between JBBR and CenterPoint) "as to liability . . . and that the case be set for a trail as to [Zenith]'s damages."[79]  Zenith's overarching argument is that CenterPoint failed to achieve Final Completion under the contracts.[80]

Zenith does not make distinct arguments under the various agreements and, instead, combines the two together and seemingly argues as if the contracts are one.  First, Zenith claims that the Court may interpret both the Purchase Agreement and the Construction Management Agreement because "they are clear and unambiguous."[81]  Zenith provides that both contracts "unambiguously require" CenterPoint to cause Ragnar and any other contractor to achieve Final

---

[75] *See* Judicial Action Form, Oct. 18, 2021 (D.I. 94).
[76] *See* Order, Jan. 27, 2022 (D.I. 105).
[77] *See* Pls.' Mot. for Summ. J.
[78] *See* Def.'s Mot. for Summ. J.
[79] Pls.' Mot. for Summ. J. at 32.
[80] *See id.* at 31-32.
[81] *Id.* at 23.

11

Completion.[82]  Zenith relies on the language in the Purchase Agreement that requires CenterPoint to "use its reasonable best efforts to achieve, and to cause [Ragnar] (and any other applicable third party contractors or service providers) to achieve, Final Completion."[83]  Zenith also points to the language of the Construction Management Agreement that requires CenterPoint to "manage [Ragnar's] performance and completion of the Work under the Construction Contract until the Final Completion Certificate is issued and accepted by [JBBR]."[84]  As such, Zenith claims that the contracts' language is clear and unambiguous, and the only remaining issue is "whether there is any factual dispute that CenterPoint failed to achieve Final Completion."[85]

Second, Zenith argues that it is undisputed that CenterPoint failed to achieve Final Completion for several reasons.[86]  Zenith states that the Terminal had to operate in cold weather to satisfy the requirements of the ExxonMobil contract with the Terminal, and the installations relating to cold-weather operations were not completed.[87]  Zenith, anticipating CenterPoint's argument, contends that simply completing the items on the "punchlist" does not equate to Final Completion.[88]  As a final point, Zenith argues that CenterPoint failed to use its "reasonable best efforts" to achieve Final Completion and failed to act as a "reasonably prudent construction manager in the construction industry."[89]

---

[82] *Id.* at 24.
[83] *Id.* at 24, Ex. N (Purchase Agreement) § 6.15(a).
[84] *Id.* at 24, Ex. O (Construction Management Agreement) at Schedule A.
[85] *Id.* at 25.
[86] *See id.* at 26.
[87] *Id.* at 26-27. On May 28, 2014, JBBR and ExxonMobil entered into a "Terminal Services Agreement," whereby ExxonMobil was to supply minimum amounts of crude oil to the Terminal or make monthly payments if the target amounts of oil were not supplied. *See id.* at 3, Ex. F (Terminal Services Agreement). ExxonMobil was the only customer of the Terminal. *See id.* at 3.
[88] *See id.* at 27-28.
[89] *See id.* at 29-31; *see also id.*, Ex. N (Purchase Agreement) § 6.15(a) (providing the "reasonable best efforts" language), Ex. O (Construction Management Agreement) § 2(b) (providing the "reasonably prudent construction manager" language).

12

In sum, Zenith says no genuine dispute as to any material fact exists relating to CenterPoint's alleged failure to achieve Final Completion such that summary judgment should be granted in its favor on liability, plus there should be a trial for damages.[90]

## B. THE CENTERPOINT MOTION

CenterPoint seeks summary judgment on Count I (breach of the Purchase Agreement between Zenith and CenterPoint) and Count II (breach of the Construction Management Agreement between JBBR and CenterPoint). CenterPoint contends that it is entitled to summary judgment because: (1) there was no breach of either contract;[91] (2) the statute of limitations bars the claims;[92] and (3) Zenith failed to submit evidence that it suffered damages resulting from CenterPoint's conduct.[93]

First, with respect to the Purchase Agreement, CenterPoint argues it complied with all obligations under the Purchase Agreement, and the alleged deficiencies of which Zenith now complains are not required to achieve Final Completion.[94] CenterPoint maintains that it completed all items on the punchlist sufficient to achieve Final Completion.[95] Moreover, CenterPoint claims the later-discovered issues with steam/condensate and hot oil systems are the fault of Wilson's design, not any construction work supervised by CenterPoint, and Zenith never listed these deficiencies on its letter that formed the basis for its refusal to issue the Final Completion Certificate.[96]

On the Construction Management Agreement, CenterPoint advances largely the same arguments as it did for the Purchase Agreement. Specifically, CenterPoint says it properly

---

[90] *See id.* at 31-32.
[91] *See* Def.'s Mot. for Summ. J. at 24-30.
[92] *See id.* at 30-31.
[93] *See id.* at 31-34.
[94] *Id.* at 25.
[95] *Id.* at 25-26.
[96] *Id.* at 26-27.

supervised Ragnar's punchlist work, and nothing more was required to achieve Final Completion.[97]  In addition, CenterPoint notes that the Construction Management Agreement did not place any obligations on CenterPoint for Wilson's design of the Terminal.[98]  As such, CenterPoint achieved Final Completion and is not responsible for Wilson's deficiencies.

Second, CenterPoint argues Zenith's claims are barred by Delaware's three-year statute of limitations on contract claims.[99]  CenterPoint states that Zenith discovered the alleged deficiencies no later than March 2016; the limitations period ran by March 2019; and Zenith did not file this lawsuit until October 2019.[100]

Finally, CenterPoint claims that Zenith "has not adduced any evidence that it suffered any damages as a proximate cause of any contract breach by CenterPoint."[101]  CenterPoint says that any issues with the steam/condensate and hot oil systems, and the lack of testing of those systems, goes to the liability of Ragnar and Wilson, which have been asserted in the related litigation in Illinois.[102]  Moreover, the "submission of a request for issuance of a Final Completion Certificate [by CenterPoint] in October 2015 did not prejudice Zenith's claims against Ragnar[] and Wilson."[103]

## IV.    STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled.  The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[104]

---

[97] *Id.* at 29.
[98] *Id.* at 29-30.
[99] *Id.* at 30.
[100] *Id.* at 31.
[101] *Id.*
[102] *Id.* at 32-33.
[103] *Id.* at 33.
[104] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

14

Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[105] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[106] The moving party bears the initial burden of demonstrating that the undisputed facts support its claims or defenses.[107] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[108]

"These well-established standards and rules equally apply [to the extent] the parties have filed cross-motions for summary judgment."[109] Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[110] But where cross-motions for summary judgment are filed and an issue of material fact exists, summary judgment is not appropriate.[111] To determine whether there is a genuine issue of material fact, the Court evaluates each motion

---

[105] *See Merrill*, 606 A.2d at 99-100.

[106] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[107] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

[108] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[109] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Jan. 31, 2019) (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001)).

[110] Del. Super. Ct. Civ. R. 56(h).

[111] *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. June 19, 2017), *aff'd sub nom., Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008); s*ee also Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 738 (Del. Ch. 2001) ("[T]he presence of cross-motions 'does not act per se as a concession that there is an absence of factual issues.'" (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997))).

independently.[112]  And again, where it seems prudent to make a more thorough inquiry into the facts, summary judgment will be denied.[113]

## V.  DISCUSSION

### A. DELAWARE'S STATUTE OF LIMITATIONS DOES NOT BAR THE CLAIMS.

"The statute of limitations [under] 10 *Del. C.* § 8106 requires a plaintiff to bring a breach of contract claim within three years of the accrual of the cause of action."[114]  "The cause of action for a breach of contract accrues at 'the moment of the wrongful act,'"[115] and "not when actual damage results or is ascertained."[116]

CenterPoint argues that Zenith discovered the alleged deficiencies with the steam/condensate and hot oil systems no later than March 2016, but Zenith did not file this action until October 2019.[117]  Thus, CenterPoint claims the three-year statute of limitations bars the claims.[118]  Zenith counters that the events of March 2016 "merely triggered CenterPoint's obligations under Section 6.15 of the [Purchase] Agreement to cause the [steam/condensate and hot oil system] deficiencies to be fixed and to pay for the repairs."[119]  Zenith argues that throughout 2016 Ragnar and Wilson made repairs and alterations to the Terminal.[120]  Zenith maintains that, at the earliest, it was not until January 2017 that Ragnar and Wilson refused to

[112] *Motors Liquidation*, 2017 WL 2495417, at *5; *see Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del. Ch. 2003).
[113] *Ebersole*, 180 A.2d at 470-72; *Pathmark Stores, Inc. v. 3821 Assocs., L.P.*, 663 A.2d 1189, 1191 (Del. Ch. 1995).
[114] *AM Gen. Hldg.'s LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *7 (Del. Ch. Aug. 22, 2016); *see also* 10 *Del. C.* § 8106(a) (laying out the types of claims subject to a three-year statute of limitations period).
[115] *AM Gen. Hldg.'s LLC*, 2016 WL 4440476, at *7 (quoting *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999); *AssuredPartners of Virginia, LLC v. Sheehan*, 2020 WL 2789706, at *12 (Del. Super. May 29, 2020) ("For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of the breach." (internal quotations omitted)).
[116] *Davis, Bowen & Friedel, Inc. v. Disabatino*, 2016 WL 7469691, at *4 (Del. Super. Dec. 27, 2016).
[117] Def.'s Mot. for Summ. J. at 31.
[118] *Id.*
[119] Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Pls.' Opp'n") at 22, Sept. 6, 2022 (D.I. 146).
[120] *Id.* at 22-23.

take further measures.[121]  Zenith further contends that CenterPoint did not abandon its contractual obligations until June 9, 2017, when "CenterPoint sent a letter to Zenith telling it to pursue Ragnar and Wilson for the [T]erminal defects, and refusing to indemnify JBBR as required by Section 10 of the [Purchase] Agreement."[122]

The Court finds that the statute of limitations does not bar the claims.  CenterPoint appears to have chosen a date and claim it was the date of the alleged breach.  On March 7, 2016, JBBR notified Ragnar that deficiencies existed relating the steam/condensate system's functioning and asked Ragnar to remedy them.[123]  Throughout the remainder of March 2016, JBBR and Ragnar went back and forth regarding the deficiencies, with Ragnar stating it was "prepared to remedy, as a warranty item, deficiencies of [Ragnar]'s work to the extent its work does not comply with the Scope of Work found in the Construction Contract."[124]  Moreover, in April 2016, Wilson contacted Zenith to discuss improving the "steam system."[125]  This does not seem to be "the moment of the wrongful act" to trigger the breach.[126]

CenterPoint's own letter to JBBR proves there was no breach until January 2017 or later. On January 24, 2017, CenterPoint wrote to JBBR and stated that "as [JBBR] is aware, with CenterPoint's support, [Ragnar] and Wilson have been onsite [at the Terminal] seeking to address the issues raised in the [letter from JBBR on January 20, 2017]."[127]  The Court notes that CenterPoint told JBBR in January 2017 that Ragnar and Wilson were continuing to address issues raised by Zenith and JBBR.  This means that, at that time, a breach had not yet

---

[121] *Id.* at 23.
[122] *Id.*
[123] *See* Pls.' Mot. for Summ. J., Ex. T at 28-29.
[124] *See id.*, Ex. T at 30-32.
[125] *See id.*, Ex. T at 33-34.
[126] *See Fike*, 754 A.2d at 260.
[127] Pls.' Mot. for Summ. J., Ex. T at 152.

17

occurred.[128]  Moreover, Zenith filed this lawsuit in October 2019.[129]  Without even reaching

Zenith's contention that the real breach occurred in June 2017, it is clear that Zenith's October

2019 filing was well within the three-year limitations period based on CenterPoint's January

2017 letter.  Therefore, Zenith's claims are not barred by the statute of limitations.

## B. BREACH OF CONTRACT CLAIMS

The elements of a breach of contract claim are: "(1) the existence of a contractual

obligation; (2) a breach of that obligation; and (3) damages resulting from the breach."[130]

### 1. *The language of both contracts is unambiguous.*

"Delaware adheres to the 'objective' theory of contracts, i.e.[,] a contract's construction

should be that which would be understood by an objective, reasonable third party."[131]  "Contract

terms themselves will be controlling when they establish the parties' common meaning so that a

reasonable person in the position of either party would have no expectations inconsistent with the

contract language."[132]

"When the issue before the Court involves the interpretation of a contract, summary

judgment is appropriate only if the contract in question is unambiguous."[133]  Thus, the threshold

inquiry on summary judgment is "whether the contract is ambiguous."[134]  When a contract is

---

[128] *See Fike*, 754 A.2d at 260 (stating that the breach is the "moment of the wrongful act"). Neither party persuasively argues one, specific moment that constitutes the "wrongful act" leading to the alleged breaches. *See* Def.'s Mot. for Summ. J. at 30-31; Pls.' Opp'n at 22-23. However, the breach claims are premised on CenterPoint's failure to use its "reasonable best efforts" to achieve Final Completion, (*see* Am. Compl. ¶¶ 51-70), which, in essence, means that the heart of the breach claims goes to the moments that CenterPoint stopped working with Zenith on the Terminal. In January 2017, all parties were still working together. *See* Pls.' Mot. for Summ. J., Ex. T at 152.
[129] *See* Original Compl.
[130] *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2021 WL 673459, at *3 (Del. Super. Feb. 22, 2021) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).
[131] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).
[132] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
[133] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).
[134] *Id.*

18

"clear and unambiguous," the Court "will give effect to the plain-meaning of the contract's terms and provisions."[135] "Ambiguity does not exist simply because the parties disagree about what the contract means."[136] Instead, contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[137]

### a. The Purchase Agreement is unambiguous.

Purchase Agreement Section 6.15(a) is especially relevant. Section 6.15(a) is labeled "Final Completion," and it states:

> After Closing, on and subject to the terms of the Construction Contract [with Ragnar] and the Construction Management Agreement, [CenterPoint] shall use its reasonable best efforts to achieve, and to cause the EPC Contractor [Ragnar] (and any other applicable third party contractors or service providers) to achieve, Final Completion in accordance with the Approved Cost Plan and the Project Schedule and otherwise in accordance with the terms and conditions of the Construction Contract and the Construction Management Agreement in all material respects.[138]

There appears no serious dispute that Section 6.15(a) is ambiguous.[139] The Court finds that Section 6.15(a) is subject to only one reasonable interpretation—CenterPoint was required to use its "reasonable best efforts" to achieve, and cause any contractor to achieve, Final Completion. "The determination of ambiguity lies within the sole province of the court,"[140] and the Court finds that Section 6.15(a) unambiguous.

While the parties argue whether CenterPoint used its "reasonable best efforts" to achieve "Final Completion," that goes to the facts surrounding CenterPoint's efforts, not the language of

---

[135] *Osborn*, 991 A.2d at 1159-60.
[136] *United Rentals, Inc.*, 937 A.2d at 830.
[137] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[138] Pls.' Mot. for Summ. J., Ex. N (Purchase Agreement) § 6.15(a).
[139] *See id.* at 23-24 (stating Section 6.15(a) is unambiguous); Def.'s Mot. for Summ. J. at 25 (stating that Section 6.15(a) required CenterPoint to use its best efforts to cause Ragnar to achieve Final Completion).
[140] *Osborn*, 991 A.2d at 1160.

Section 6.15(a) setting out the expectations of the parties.  As such, Section 6.15(a) of the

Purchase Agreement is unambiguous.

### b.  *The Construction Management Agreement is unambiguous.*

Construction Management Agreement Section 2(b), titled "Construction Management

Services," states:

> [CenterPoint] shall perform the Services with substantially the same standard of care (including quality) as the Services were performed by or on behalf of [JBBR] prior to the Effective Date, including, without limitation, by performing the Services, at all times, as would a reasonably prudent construction manager in the construction management industry.[141]

Construction Management Agreement Section 2(h) limits Section 2, and it provides that

"except as expressly set forth in Section 2, no representations, warranties or guaranties of any

kind, express or implied . . . are made by [CenterPoint] with respect to the services provided

under [the Construction Management Agreement]," and that all representations and warranties

are waived and disclaimed to the fullest extent of the law.[142]

The Court finds that the language of the Construction Management Agreement is

unambiguous and subject to only one reasonable interpretation.  The Court finds that CenterPoint

was required to oversee the construction project in the same way it did when it owned the

Terminal, and in the same way a "reasonably prudent construction manager in the construction

industry" would oversee the project.

Here, the parties argue whether CenterPoint fulfilled its duty to act as a "reasonably

prudent construction manager."[143]  The Court notes that goes to the facts surrounding

---

[141] Pls.' Mot. for Summ. J., Ex. O § 2(b).

[142] *Id.*, Ex. O § 2(h).

[143] *See id.* at 30-31 (arguing that if CenterPoint continued as owner of the Terminal, it would not have accepted a facility "that did not perform at the level required by the contracts"); Def.'s Mot. for Summ. J. at 19-20 (arguing that JBBR knew that "CenterPoint was not a professional provider of these services, and that CenterPoint personnel would not spend full time on providing" services outside the alleged scope of the contracts).

CenterPoint's efforts, not the language of the Construction Management Agreement Section 2(b). Thus, Section 2(b) is unambiguous.

### 2. *Genuine issues of material fact exist for the Purchase Agreement.*

As to Count I, the difficulty is to demonstrate that no genuine issue of material fact exists with respect to Purchase Agreement Section 6.15(a). The key language is "reasonable best efforts," *i.e.*, whether CenterPoint used "reasonable best efforts" to achieve, and cause any contractor to achieve, Final Completion.[144]

Zenith argues that the Purchase Agreement "unambiguously require[s]" CenterPoint to cause Ragnar and any other contractor to achieve Final Completion.[145] Moreover, Zenith complains that CenterPoint "did not use reasonable best efforts"[146] and "failed to achieve Final Completion."[147] Conversely, CenterPoint maintains it complied with all obligations under the Purchase Agreement, and the alleged deficiencies were not required to achieve Final Completion.[148] Interestingly, in its Opposition, CenterPoint seems to concede that "[a]t the very least, a genuine issue of fact exists as to whether CenterPoint used its 'reasonable best efforts.'"[149] In the CenterPoint Motion's Opening Brief, however, CenterPoint argues that it used its reasonable best efforts to cause Ragnar to achieve Final Completion when it oversaw Ragnar's completion of the "punchlist" items.[150] These arguments seem to contradict.

Under Delaware law, "reasonable best efforts" means a party is "obligat[ed] to take all reasonable steps to solve problems and consummate the transaction."[151] However, "it cannot

---

[144] *See* Pls.' Mot. for Summ. J, Ex. N § 6.15(a).
[145] *Id.* at 24.
[146] *Id.* at 29.
[147] *Id.* at 26.
[148] Def.'s Mot. for Summ. J. at 25.
[149] Def.'s Opp'n at 28-29.
[150] Def.'s Mot. for Summ. J. at 25-26.
[151] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017) (citing *Hexion Specialty Chems., Inc. v. Huntsman Corp*, 965 A.2d 715, 755-56 (Del. Ch. 2008)).

21

mean everything possible under the sun."[152]  In the context of merger agreements, the Court of Chancery has "looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty" in determining whether the "reasonable best efforts" standard was met.[153]  "Determining whether a party used reasonable best efforts is an inherently factual inquiry."[154]

The Court finds that there exists a factual question as to whether CenterPoint took "all reasonable steps to solve problems."  For instance, after JBBR denied the request for a Final Completion Certificate in October 2015,[155] CenterPoint oversaw Ragnar to finish the items on the punchlist, which was completed in February 2016.[156]  The correspondence between the parties from December 2016 to January 2017 appears show there was engagement to construct the Terminal and achieve Final Completion.[157]  However, it appears Final Completion was never achieved.  For example, under the definition of "Final Completion," "all testing (including hydrotesting) and coating" must be completed.[158]  Gavin Palmer, "JBBR's engineering expert," testified during his deposition that there was no evidence the steam system was hydrotested.[159]  CenterPoint does not address this alleged defect in its briefing.  While Final Completion was not achieved, it is not clear whether CenterPoint made "reasonable best efforts" to achieve Final

---

[152] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *91 (Del. Ch. Nov. 30, 2020) (citing *Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 763 n.60 (Del. Ch. 2009)).
[153] *Menn v. ConMed Corp.*, 2022 WL 2387802, at *35 (Del. Ch. June 30, 2022) (citing *Akron, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018)).
[154] *In re WeWork Litig.*, 2020 WL 6375438, at *9 (Del. Ch. Oct. 30, 2020). The Chancery Court stated this rule in the context of a motion to dismiss, noting that whether a party used reasonable best efforts is an inquiry "not readily amenable to resolution at the pleadings stage." *Id.* Nonetheless, the inquiry is still "inherently factual." *See id.*
[155] *See* Pls.' Mot. for Summ. J., Ex. T at 8-10.
[156] Def.'s Mot. for Summ. J. at 22, Ex. 29 (displaying the letter from Ragnar to JBBR requesting Final Completion Certificate).
[157] *See* Pls'. Mot. for Summ. J., Ex. T at 137-53.
[158] *See* Am. Compl., Ex. E (Construction Contract) § 1.1.
[159] *See* Pls.' Mot. for Summ. J., Ex. Z (Palmer Dep.) at 45:22-48:2.

Completion because the Court is not clear on whether hydrotesting, for example, was a necessary and "reasonable step to solve [a] problem[] and consummate the transaction."[160]

CenterPoint, in essence, attempts to sidestep the deficiency issues by placing blame on Ragnar and Wilson and claiming CenterPoint has no responsibility for them.[161] However, the Court notes that the plain language of the Purchase Agreement requires CenterPoint to achieve, and cause any third party contractor to achieve, Final Completion.[162] Thus, CenterPoint could be responsible for the contractors' deficient performances, if any, in failing to achieve Final Completion.

CenterPoint was responsible for Ragnar's and Wilson's work. Moreover, there exists a genuine issue of material fact as to whether CenterPoint used its "reasonable best efforts" to achieve Final Completion. Due to this dispute of fact, the Court **DENIES** both the Zenith Motion on Count I, and the CenterPoint Motion on Count I.

### 3. *Genuine issues of material fact exist for the Construction Management Agreement.*

On Count II, the Court notes that the issue for each party is whether CenterPoint performed its services "as would a reasonably prudent construction manager in the construction management industry."[163] Largely, the parties make similar arguments for the Construction Management Agreement and the Purchase Agreement.

Zenith argues, again, that the Construction Management Agreement "unambiguously require[s] CenterPoint to cause Ragnar or any other contractor to achieve Final Completion."[164] Zenith points to Schedule A of the Construction Management Agreement, which requires

---

[160] *Williams Cos., Inc.*, 159 A.3d at 272.
[161] *See, e.g.*, Def.'s Opp'n at 21-25 (arguing that CenterPoint is not responsible for the design of the Terminal).
[162] *See* Pls.' Mot. for Summ. J., Ex. N § 6.15(a).
[163] *See id.*, Ex. O § 2(b).
[164] *Id.* at 24.

23

CenterPoint to "manage [Ragnar's] performance and completion of the Work under the Construction Contract until the Final Completion Certificate is issued and accepted by [JBBR] and payment is made therefor."[165]  Zenith complains that CenterPoint breached the Construction Management Agreement because, *inter alia*, the proper cold-weather installations were not made at the Terminal, and completing the punchlist, alone, was insufficient to achieve Final Completion.[166]

CenterPoint argues it properly supervised Ragnar's punchlist work, and nothing more was required.[167]  Moreover, CenterPoint says that "[n]othing in the Construction Management Agreement required CenterPoint to manage any work by Wilson," such that CenterPoint is not responsible for Wilson's design deficiencies.[168]  To CenterPoint, the punchlist was enough, and Zenith's "complaints" regarding cold weather installations are outside the scope of the Construction Management Agreement.[169]

The Court notices that the parties do not really address the factual arguments of the other. The issue regarding the Construction Management Agreement is the "reasonably prudent construction manager" language in Section 2(b).  The "reasonably prudent person" standard "is an objective standard" and a "fact-intensive inquiry."[170]

Section 2(b) of the Construction Management Agreement states:

[CenterPoint] shall perform the Services with substantially the same standard of care (including quality) as the Services were performed by or on behalf of [JBBR] prior to the Effective Date, including, without limitation, by performing the Services, at all times, as would a reasonably prudent construction manager in the construction management industry.[171]

---

[165] *Id.*, Ex. O at Schedule A. It also argues CenterPoint did not act as a "reasonably prudent construction manager" as required by Section 2(b). *See id.* at 31, Ex. O § 2(b).
[166] *See id.* at 26-28.
[167] Def.'s Mot. for Summ. J. at 29.
[168] *Id.* at 19-20.
[169] *Id.* at 29-30.
[170] *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *11 (Del. Ch. June 23, 2015).
[171] Am. Compl., Ex. B § 2(b).

The Court finds that a genuine issue of material fact exists as to whether CenterPoint acted as a reasonably prudent construction manager. For its part, CenterPoint says that overseeing Ragnar's punchlist completion is enough for a Final Completion Certificate and enough to meet its duties under the Construction Management Agreement.[172] Zenith says that completing the punchlist was not enough for Final Completion, and it was not enough for CenterPoint to satisfy its duties. Zenith points to Schedule A of the Construction Management Agreement, requiring CenterPoint to manage Ragnar and other contractors until JBBR issues a Final Completion Certificate.[173] Zenith even tells the Court that it "need not consider the standard of care issue" because Final Completion was not achieved.[174]

While it is true that Final Completion was not achieved, as explained *supra*, in section V(B)(2), that does not end this inquiry. Lack of Final Completion does not, *per se*, constitute a breach resulting in damages, especially considering the Purchase Agreement's language requiring CenterPoint to use "reasonable best efforts" to achieve Final Completion.[175] Similarly, a crucial determination is whether CenterPoint acted as a "reasonably prudent construction manager" in performing its duties under the Construction Management Agreement. CenterPoint says it did and provides factual support.[176] Zenith says CenterPoint did not and provides factual

---

[172] *See* Def.'s Mot. for Summ. J. at 29-30.

[173] *See* Pls.' Opp'n at 19-20; Pls.' Mot. for Summ. J., Ex. O at Schedule A.

[174] Pls.' Opp'n at 19.

[175] *See* Pls.' Mot. for Summ. J., Ex. N § 6.15(a). Here, Purchase Agreement between Zenith and CenterPoint required CenterPoint to use "reasonable best efforts" to achieve Final Completion. *See id.* The Construction Management Agreement between JBBR and CenterPoint required CenterPoint to oversee contractors' work until Final Completion was achieved. *See id.*, Ex. O at Schedule A. Final Completion was not achieved, but there exists a question of fact regarding whether CenterPoint oversaw the contractors until the contractors stopped performing, and a question of fact regarding whether damages were suffered if CenterPoint failed to oversee the contractors. The two agreements at the center of this litigation are tied together in many respects, and at some points they appear to conflict. *Cf. id.*, Ex. N § 6.15(a) (requiring CenterPoint to use reasonable best efforts to cause contractors to achieve Final Completion), *with id.*, Ex. O at Schedule A (requiring CenterPoint to manage the contractors' performance until Final Completion was achieved).

[176] Def.'s Mot. for Summ. J. at 19-20.

support.[177] When such conflicting arguments are given regarding a "reasonably prudent" standard, and the evidence is not persuasive to one side, "[i]t is for a [factfinder] to reconcile the conflicting [arguments and evidence] of" Zenith and CenterPoint.[178]

Therefore, while it is likely that Final Completion was not achieved, the Court finds that there are genuine issues of material fact regarding whether CenterPoint acted as a "reasonably prudent construction manager" as required by the Construction Management Agreement. Accordingly, the Court must **DENY** the Zenith Motion and the CenterPoint Motion as to Count II.

### 4. *CenterPoint's argument for lack of damages fails.*

CenterPoint's final argument is that Zenith has produced no evidence that it suffered damages as a proximate cause of any contract breach by CenterPoint.[179] CenterPoint argues that, at most, Zenith suffered damages relating to the steam/condensate and hot oil systems, and that those damages will be assessed against Ragnar and Wilson in the Illinois Action.[180]

Zenith counters that its damages arise from CenterPoint's breaches relating to CenterPoint's failure to: (i) cause Ragnar to achieve Final Completion; (ii) remedy defects at the Terminal relating to cold weather installations; (iii) cause liquidated damages to be paid; and (iv) indemnify Zenith. Zenith also seeks damages for fees and cost incurred in the Illinois Action.[181] Zenith argues that all the damages arise from CenterPoint's breach of the Purchase Agreement and breach of the Construction Management Agreement.[182]

---

[177] Pls.' Mot. for Summ. J. at 31.
[178] *See Garcia-Trujilio v. Atl. Bldg. Assocs., Inc.*, 2020 WL 4816343, at *3 (Del. Super. Aug. 13, 2020) (finding, in the context of the "reasonably prudent" standard, that when the parties disagreed regarding the construction manager's control over a work site, and conflicting evidence existed, summary judgment was improper).
[179] Def.'s Mot. for Summ. J. at 31.
[180] *Id.* at 33-34.
[181] Pls.' Opp'n at 24. Zenith provides money damages figures for all of the alleged deficiencies, which come from an engineering report. *See id.* at 26-27; *see also* Pls.' Mot. for Summ. J., Ex. Y (Ambitech Report).
[182] Pls.' Opp'n at 24-25.

"Contract damages are designed to place the injured party in an action for breach of contract in the same place as [the party] would have been if the contract had been performed."[183] The non-breaching party is "entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made."[184]

The Court finds that Zenith has demonstrated a factual issue on damages. CenterPoint essentially blames Ragnar and Wilson, and attempts to avoid wrongdoing at the Terminal.[185] Zenith pled damages resulting from the various deficiencies at the Terminal, as highlighted in its argument above.[186] Zenith has also implicitly conceded that the actual damages sum is a fact issue because Zenith requests a trial for damages in the Zenith Motion.[187] The Court finds that there is a fact issue as to whether CenterPoint breached the Purchase Agreement and/or the Construction Management Agreement.[188] If CenterPoint breached either, Zenith likely suffered damages from CenterPoint's breach; namely, in failing to properly oversee Ragnar, which would be "damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made."[189] Ultimately, CenterPoint's claim that Zenith suffered no damages cannot be determined at this time because there exist factual disputes regarding whether a breach occurred. Zenith has set forth circumstances that will lead to money damages if a breach is later determined to have occurred.

Therefore, the Court is **DENYING** the CenterPoint Motion on the issue of whether Zenith has suffered damages.

---

[183] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotations omitted).
[184] *Id.* (internal quotations omitted).
[185] *See* Def.'s Mot. for Summ. J. at 33-34 (arguing that CenterPoint only forwarded Ragnar's Final Completion request to JBBR, and that CenterPoint suffered no damages from such a request).
[186] *See* Pls.' Opp'n at 26-27; Am. Compl. ¶¶ 51-70, Prayer for Relief.
[187] Pls.' Mot. for Summ. J. at 32 ("Plaintiffs respectfully request that summary [j]udgment as to liability be entered against CenterPoint, and that the case be set for a trial as to Plaintiffs' damages.").
[188] *See supra* sections V(B)(2)-(3).
[189] *Deloitte & Touche, LLP*, 974 A.2d at 146 (internal quotations omitted).

## VI. CONCLUSION

The Court finds there are genuine issues of material fact on CenterPoint's performance and liability under both the Purchase Agreement and the Construction Management Agreement. For the foregoing reasons, the Court **DENIES** the Zenith Motion and the CenterPoint Motion.

**IT IS SO ORDERED**

Dated: January 23, 2023
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge

cc: File&ServeXpress